UNITED STATES, Appellee

v

VAL R. FERNENGEL, JR., Recruit (E–1),
U. S. Army, Appellant

11 USCMA 535, 29 CMR 351

No. 13,850

Decided June 17, 1960

*First Lieutenant Ralph T. Smith* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Ralph Herrod.*

*First Lieutenant George H. Parsons* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel James G. McConaughy.*

ROBERT E. QUINN, Chief Judge:

On his plea of guilty the accused was convicted of, and sentenced for, desertion, in violation of Article 85, Uniform Code of Military Justice, 10 USC § 885. Intermediate appellate authorities affirmed. Thereafter, the accused petitioned this Court for further review, and we granted the petition to consider whether his plea of guilty was provident.

The accused enlisted in the Army in March 1958. He was then eighteen years of age. Just four months after enlistment, he began a series of unauthorized absences. First he was absent from July 4 to July 17, 1958; then he was gone from August 6 to August 9, 1958. For these offenses he was tried by summary court-martial and sentenced to confinement for thirty days. On September 20 he again absented himself and remained away until November 15. He was tried and convicted by special court-martial for this offense, and sentenced to partial forfeiture of pay and confinement at hard labor for six months. On June 11, 1959, he absented himself once more and remained away until he was apprehended on September 17, 1959. This last absence was made the basis for the desertion charge in this case.

At trial, the accused testified during sentence procedure that when he was about eight years of age his family was "split up by the Welfare" department with each of several children being placed in foster homes. Later, the accused was told that "both parents were dead." Eventually, the accused went to Boys Town, Nebraska. During a vacation from that community he stayed at one of the foster homes in which he had previously been raised. On that occasion a brother "located" him and told him his mother was alive and living with his step-father. He obtained permission from Boys Town and the Welfare department to stay with his mother. The move, however, was an unhappy one. Both adults drank heavily, and "kept after" the accused to get a job. As a result, the accused

"quit school" and obtained employment as a laborer in "construction" work. Most of his earnings went for the purchase of liquor for his parents. The accused got "pretty well fed up." He did the only thing he knew—he joined the Army. The account of his service life is summed up in the following testimony:

"When I did join the service, things got worse. Everything I seen around me was fighting, cussing, swearing, and it was all against what I had learned; and I really didn't know where I was going or what I was doing; and that may be the reason why I absented myself from the service. I'm not even sure, myself.

. . . . .

". . . I was taught to respect other people's rights and to respect other people for what they were, not for what they wore, but for what the man is; and I was taught to respect other people's property; and I couldn't do that—not and live with the other people, the men in my barracks and the men around me, because if you wouldn't go out and drink with them, you weren't any good, and every other word they used was a cuss word. It was no good. I was taught to have more respect for a human being than that."

The accused discussed his problem with his first sergeant, the company commander, and the Chaplain. The first sergeant "laughed"; the company commander "told . . . [him] to grow up"; and the Chaplain listened, but "there was no help." The accused made efforts to find suitable companions but "the few" he discovered "found it easier to go along with the crowd than to stand up for what they believed in."

When the accused's direct examination was completed, trial counsel briefly cross-examined him and some questions were asked by the law officer and the president of the court. At that point in the proceedings the following colloquy took place:

"COLONEL RICHARDS: I don't know

536

whether it's appropriate to ask about this or not, but it's hard for me to reconcile his plea of guilty to desertion with what Recruit Fernengel has said. Is it permissible to ask him what he has in mind in pleading guilty to this charge?

"LO: No, sir. It isn't, Colonel, because I inquired myself, as to the guilty plea of the accused at the out-of-court hearing, and he has persisted in his plea, so there is nothing to indicate that the plea is improvident, you see, or that—

"LO: Recruit Fernengel, do you desire to change your plea at this time to a plea of not guilty?

"RECRUIT FERNENGEL: A plea of guilty.

"LO: Lieutenant Eisner, did you have that in mind, or is there any question.

"DC: The way I see it, sir, there is nothing in substance in the evidence or the testimony of Recruit Fernengel to show that he intended to return to the Army upon the happening of a contingency or any other event; and basically the plea of guilty is based upon that factor.

"LO: That is right. In other words, the accused persists in his plea of guilty of the offense of desertion as charged, he knowing that if he has plead so, this would indicate that he intended to stay away from the Army permanently.

"DC: If I may add, normally the charge, the legal defense to desertion, does not consider mitigating factors or facts in extenuation. That bears upon the sentence, of course, but not upon the merits of whether a person intended to return. The legal question is a simple one—did he intend to return to the Army?—and so long as the evidence in the case tends to indicate that the accused did not have an intent to return to the Army upon the happening of a certain event, upon the happening of a contingency, I think a plea of guilty was warranted. The fact that he testified here I think should be taken by the court in its deliberation upon a just and merciful sentence, because, unfortunately, the defense was rather limited by the lack of any evidence showing an intent to return to the Army upon the happening of a certain event or the happening of a contingency."

Defense counsel's statements are ambiguous. On the one hand, they can be construed as indicating that defense counsel was merely assuring Colonel Richards he had considered the possibility that the accused had really entertained an intent to return to the service on the happening of a contingency or some future event, but there was no evidence known to him, or expressed in the testimony of the accused, to show any intent other than that charged; consequently, he had no basis upon which to contest the prosecution's case. In other words, he and the accused had "weighed the evidence and determined that it was inadequate for an effective legal defense or to negate the existence of a specific intent [which was shown by evidence in the hands of the prosecution]." United States v Hinton, 8 USCMA 39, 23 CMR 263. This is the view urged by the Government. Appellate defense counsel, however, maintain the statements indicate trial defense counsel believed it was necessary for the accused to prove affirmatively that he intended to return upon some contingency or event in order to avoid conviction for desertion. Since the accused decided to plead guilty "after . . . defense counsel . . . advised . . . [him] of . . . [his] rights," it follows, according to appellate defense counsel's argument, that the accused's plea was based upon a misconception of law and was improvident. See United States v Welker, 8 USCMA 647, 25 CMR 151; United States v Hamill, 8 USCMA 464, 24 CMR 274.

The issue is not free from doubt. Under the circumstances, it is appropriate to return the case to the board of review for further proceedings. In its discretion, the board of review may affirm the findings of guilty of unauthorized absence, which are consistent with the accused's sworn testimony, and reassess the sentence on the basis there-

**537**

of; or it can inquire into the circumstances of defense counsel's advice to the accused and the accused's decision to plead guilty to determine if he was properly advised of his rights in the premises. See United States v Allen, 8 USCMA 504, 25 CMR 8.

The decision of the board of review is reversed. The record of trial is returned to The Judge Advocate General of the Army for resubmission to the board of review for further proceedings consistent herewith.

Judge FERGUSON concurs.

LATIMER, Judge (dissenting) :

I dissent.

If there is any improvidence in this plea of guilty, it must be predicated on a belief that defense counsel was uninformed on the rudimentary principles of criminal law. He was a certified lawyer, the offense charged was not complicated, and I have every reason to believe he knew the Government had the burden of proving the element of intent. Aside from his professional standing, as I interpret the record, he well knew that the evidence for the Government would overwhelmingly establish a base for the inference of an intent to remain away permanently. The specification so alleged and in an out-of-court conference, the law officer expressly announced that the plea admitted that element of the offense. Moreover, the accused, in his sworn testimony from the witness stand, admitted he went absent without leave because he did not want to remain a member of the Army and, at the time of trial, he had not changed his mind. His military record is in keeping with his admission, for it disclosed that he enlisted on March 6, 1958. His first ab-

sence without leave commenced on July 4, 1958, and terminated on July 17, 1958. He left his unit without permission on August 6, 1958, and was returned to duty on August 9, 1958. He next absented himself without authority on September 20, 1958, and was not returned to the service until November 15, 1958. The absence which commenced the period of this desertion charge occurred on June 11, 1959, and accused was involuntarily returned to military control on September 17, 1959. His conduct while in an absentee status pointed unerringly to an abandonment of the service, and there is not one scintilla of evidence to the contrary. Either accused intended to return or he intended to remain away and, faced with overwhelming evidence against his client, trial defense counsel was trying to explain that in his pretrial efforts he had been unable to uncover any testimony which would neutralize the effect of the evidence. Merely because the record indicates he did not phrase his thoughts in a careful and precise manner does not prove he misunderstood the law.

While my associates say there is some doubt about the issue, I am of the opinion that if they would consider the record by its four corners, and particularly the questions and answers in the out-of-court hearing, accused's sworn testimony on the witness stand, the law officer's comment on the element of intent and the entire courtroom drama, the lack of certainty would disappear. And certainly I would not cast some shadow on the adequacy of representation without a better showing than I find in this record.

I would affirm the decision of the board of review.