![black bar]

## UNITED STATES, Appellee

v

## RAYMOND G. BROY, Corporal, U. S. Marine Corps, Appellant

### 14 USCMA 419, 34 CMR 199

No. 17,173

March 13, 1964

*Fred W. Shields, Esquire,* argued the cause for Appellant, Accused.

With him on the brief were *Lieutenant Colonel Charles B. Sevier,* USMC, and *Lieutenant John Thomas Montag,* USNR.

*Commander C. J. Mackres,* USNR, argued the cause for Appellee, United States. With him on the brief were *Captain G. M. Fisher,* USN, *Commander F. L. Forshee,* USN, and *Lieutenant A. D. Christian,* USNR.

## Opinion of the Court

QUINN, Chief Judge:

The primary question on this appeal is whether the accused was, as the Government contends, a "gold bricker" trying to avoid ordinary brig routine, or whether, as he contends, he was subjected to gross mistreatment and abuse by brig personnel as part of a calculated effort that deprived him of a speedy trial.

On November 9, 1962, the Criminal Investigation Section at the Marine Corps Air Station, El Toro, California, received a complaint about bad checks issued by the accused. An investigation was begun. While the investigation was still pending, the accused absented himself without authority. On his return, on November 26, he was confined in the station brig. In January, he was formally charged with thirteen specifications of issuing bad checks, in violation of Article 123a of the Uniform Code of Military Justice, 10 USC § 923a. After investigation under the provisions of Article 32 of the Uniform Code, 10 USC § 832, the charges were referred to trial by general court-martial. The case came on to be heard on March 5, 1963.

At trial, the accused appeared with his left leg in a cast. In an out-of-court hearing before the accused entered his plea, civilian defense counsel indicated the cast resulted from mistreatment of the accused while in confinement. The representations were made in the course of some preliminary comments on a motion to dismiss the charges on the ground the accused had been deprived of a speedy trial. Counsel's remarks did not clearly indicate whether the alleged abusive treatment of the accused constituted a separate reason for dismissal, or whether it was advanced as part of the claim of denial of a speedy trial by "oppressive delay." See United States v Brown, 10 USCMA 498, 504, 28 CMR 64. Following an enumeration by trial counsel of the steps taken to bring the charges to trial, the law officer suggested to defense counsel that accused's treatment in the brig was a matter "separate and distinct from" the speedy trial issue. Thereupon, defense counsel remarked that, if it was "the desire of the law officer," he would frame the application to dismiss in the form of "two motions," one based upon the more than three months' delay between accused's confinement and the trial, and the other predicated upon the "cruel and unusual punishment inflicted" upon the accused. From that point on, the hearing proceeded as if there were two mutually exclusive motions to dismiss. Both motions were denied.

On this appeal, appellate defense counsel, none of whom represented the accused at trial, contend the law officer misapprehended the nature of the defense position. They maintain that all circumstances surrounding a delay in trial are relevant in determining whether the delay is "oppressive." From that premise, they conclude the law officer erred by giving no consideration to the evidence of accused's mistreatment in deciding the motion to dismiss for "oppressive delay." Government counsel argue that the kind of treatment the accused received at the hands of the Government before trial is wholly immaterial, because only those circumstances which tend to explain the lapse of time are relevant. "Every case," say Government counsel, which they have examined, "is concerned with *time.*" Most cases do indeed deal with the factors explaining the delay between charge and trial. But, there are other matters that may tend to make a delay in prosecution oppressive.

One of the most frequently cited cases on the right to speedy trial is Petition of Provoo, 17 FRD 183, 195, 203, affirmed, 350 US 857, 100 L ed

**421**

761, 76 S Ct 101 (1955). There, the defendant was held in close confinement by military authorities for a certain time. In September 1949, he was given an undesirable discharge. However, he was immediately taken into custody by the Federal Bureau of Investigation on a charge of treason. He was held without bail until trial, in October 1952. Some months before trial, he had been examined by a medical doctor of the United States Public Health Service. In the doctor's opinion, the defendant's emotional stability had " 'suffered severely under the pressure of long confinement.' " Considering a motion to dismiss for lack of speedy trial, District Judge Thomsen found that the long period of defendant's confinement had "seriously impaired his ability to defend himself." He held the defendant had been denied a speedy trial, and granted the motion to dismiss. The ruling was affirmed by the United States Supreme Court. If, as Judge Thomsen held, the effects of the mere fact of confinement can be considered in determining whether the delay in trial is oppressive, certainly the nature and the effect of the treatment accorded the defendant while in confinement are similarly relevant circumstances. It would also seem that cruel and unusual punishment inflicted upon the accused before trial by Government agents as part of a "willful, purposeful, vexatious," scheme to impede the accused in preparation of his defense is a relevant consideration on a motion to dismiss for denial of a speedy trial. See United States v Brown, 13 USCMA 11, 14, 32 CMR 11. Accepting the legal principle of the defense argument, however, would not necessarily bring us to the result advanced by the accused.

A number of preliminary questions are presented. It is uncertain, for example, whether defense counsel intended to include the accused's treatment in confinement as part of the speedy trial motion. There is also the possibility of waiver of the point in issue by defense counsel's affirmative acceptance of the suggestion that the confinement treatment be considered a "separate and distinct" ground for relief. See United States v Ayers, 14

422

USCMA 336, 34 CMR 116. All these matters aside, and, assuming for purposes of this appeal, that the law officer erred by disregarding the accused's treatment in confinement as a circumstance bearing upon the speedy trial motion, we are still constrained to affirm his ruling.

Substantial evidence of the accused's pretrial treatment was introduced. The accused testified on the issue; the brig officer was examined; and the accused's medical record was introduced in evidence. So far as the record shows, and it is not contended otherwise on this appeal, the defense introduced all the evidence it had, or wanted to present, in support of the claim of cruel and unusual punishment. The full compass of the defense allegation is, therefore, before us, and we can properly evaluate its merit. See United States v Walbert, 14 USCMA 34, 33 CMR 246; United States v Brown, 13 USCMA 11, 32 CMR 11. What appears from the evidence may be a dismal, even disquieting, picture of insensate treatment, but there is no intimation whatever that the treatment was part of a deliberate plan to impede the accused in the preparation of his defense, or that it had that effect.

As noted earlier, the accused was confined in the station brig on November 26, 1962. Persons in confinement were grouped in one of three custody classifications: minimum, medium, and maximum. The latter class was composed of those considered to be incapable of following orders, or who might be inclined to attempt escape. The accused was in the maximum custody class. Since he was a noncommissioned officer, he was "treated somewhat differently" from nonrated prisoners in that he was not allowed to go out on work parties with persons of lesser rank. Besides work details, brig discipline included a "daily activity schedule." All prisoners, sentenced and unsentenced alike, except those over forty years of age and those with a "medical chit," were subject to the schedule. The accused was twenty-eight years of age. The schedule was not completely spelled out in the record, but it apparently included "marching,"

and what the brig officer described as a "strenuous physical fitness program," consisting of push-ups, stepups, squats, deep knee bends, other body, leg, arm and neck exercises, and running. A prisoner who did not perform an exercise "properly," that is, in "accordance with the standard established by the Marine Corps," was required to repeat it.

Reveille was at 4:30 a.m. Prisoners were allowed three minutes to dress and "get out on the red line . . . [for] chow." Unless excused by the medical officer, they marched to one of two dining halls for their meals. One of the messes was about one quarter of a mile from the brig; the other was a mile away. If a prisoner did not march to the mess, his meal was carried back to the brig in a "standard mess hall tray covered with another tray." In transit, hot foods "cooled off considerably." Immediately on return from breakfast, prisoners performed physical training exercises for about an hour; work parties were then formed for those on detail. Prisoners remaining at the brig apparently would march or, as the accused put it, "troop and stomp," or engage in "close order drill." The same general routine was followed after lunch, and sometimes was enforced after the evening meal. As a result of brig activities, prisoners were on their feet "all the time, except when . . . at chow."

The accused entered the Marine Corps in 1954. Before then he had had some trouble with his knees from playing football. When he "was down to San Diego" (apparently in boot camp), he had experienced "a little trouble" with them and had informed "the Captain." However, he had not had any trouble "at all lately." It may be inferred that on incarceration, he was at first able to participate fully in the brig activities. As admitted by the brig officer, soon thereafter, he "mention[ed]" his legs "were hurting as well as the lower extremities of his body." The accused characterized the report as a "complaint," but the brig officer testified he regarded it merely as an indication that the accused "was having trouble getting adjusted" to the

physical exercise program and that he had some "soreness." Nevertheless, he informed the accused he could go see the medical officer the next day. The accused testified he also suffered from, and made complaints about, "ulcers." At this point, the chronology is very sketchy.

Apparently, the accused had no medical attention until December 27. He testified that at that time he complained about stomach trouble and a backache, and asked to be hospitalized. However, he remained in the brig, and was compelled to continue with the regular routine. The accused's medical record shows he had medical attention on January 17, 1963. The diagnosis was "Strained muscle in back." There is no indication the accused was relieved in any way from full participation in the established program. His testimony supports an inference that he was not excused from any activity.

According to the accused he was compelled, every day, to do from three to four hundred stepups; from two hundred to two hundred and fifty push-ups; "all the other different types of exercises" from "mountain climb" to "squat jumps"; and from four to four and one-half hours of close order drill. He said that at "different interval[s]" he complained to the brig officer about the effects of these exercises. On January 25, he again saw the medical officer. The record entry is, "Previous knee trouble in past (played football)—X-ray both knees was negative." Nothing appears in the medical record to show that as a result of this complaint, the accused was excused from full participation in the physical training program.

One of the brig guards allegedly gave the accused special difficulty. The accused testified this guard was "sadistic" in his attitude, and went "overboard" on the accused by trying to "push" him "over . . . [his] limit." Although the accused did not say how often he was subject to this man's authority, it may be inferred he was regularly supervised by him. It also appears that during this period the accused did more exercises than other prisoners. The brig officer admitted he

had "some minor problems" with the accused, and "[o]ccasionally" the accused "might have been given more physical exercise" because he did not perform according to the Marine Corps standard. He recalled one occasion when he personally instructed the accused he "was not performing properly." On January 27, 1963, Pro-Banthine (a commercial drug used in the treatment of ulcers) and Darvon (a drug used to offset the effects of pain) were prescribed for the accused. See Physician's Desk Reference to Pharmaceutical Specialties and Biologicals, 13th Edition, 1959, at pages 699 and 792. The reason for the prescription does not appear in the accused's medical record, but the testimony indicates it was probably predicated on accused's complaint of pain. Still, the accused was not excused from any exercises. His testimony, and the other evidence, indicate he was sometimes required to repeat a series of exercises because he did not, in the judgment of the brig attendant, meet the regular achievement standard. This situation continued until February 13, 1963. That day the accused was again examined by a medical officer. The medical record entry of the examination is as follows:

"Effusion & pain knees—Bilat. Please eval J. F. Canatti no evidence of effusion. Bilateral *minimal* laxiety [sic] of collateral ligaments no 'squat type' exercises, ace wrap."

For the first time since his initial complaint about pain in the knees, the accused received a medical excuse from participating in part of the brig regimen. But it appears the excuse was not immediately communicated to the brig authorities, or, if communicated, was not acted upon by them. The brig officer admitted that no memorandum was isued to brig personnel until February 15th. That was a day after the accused again went to the medical officer. The medical record shows nothing of the clinical findings of the visit of February 14, but it repeats the prescription of February 13, namely, "no 'squat type' exercises." Since the excuse was limited to squat-type exercises, the accused was com-

**424**

pelled to perform push-ups, stepups, close order drill, running, marching, and the other activities.

The accused received another examination on February 16. The entry on the medical record is "Swelling & pain in knees increasing." The accused was directed to report to the surgery clinic for "re-evaluation." On February 18, he was examined by Dr. Eberstein. The doctor listed his findings as "Small effusion" in one knee yielding "10 cc bloody fluid." He administered an injection and told the accused to return in two days. He also issued a medical chit. On the same day, the brig officer issued a memorandum in compliance with the chit which prohibited "exercises or marching" for forty-eight hours. However, according to the accused, he was still required by the guard to do stepups and push-ups. It may be inferred that he also continued to march to the mess hall for his meals. At the end of the forty-eight-hour period of excuse, the accused was examined by Dr. Eberstein. After the accused had a "whirlpool" bath of the affected area, the doctor applied a "cylinder cast for a few weeks as therapeutic trial." Apparently he did not issue an excuse chit. It may be he assumed the cast would itself serve as a medical excuse. It did not, however, have that effect. Since the excuse of February 18 expired by its terms, and no new chit had been issued, the accused was required to follow the regular brig routine to the full extent it was physically possible. The accused testified that "since . . . [he] had . . . [the] cast on," he could not do the stepups, which entailed stepping as high as two feet, but he was forced to do push-ups. He also continued to march to chow. On February 21, Dr. Eberstein examined, and approved the cast.

According to the accused, Dr. Eberstein told him the condition of his knees was a recurrence "due to exercise" of his old difficulty. He testified the doctor indicated that an operation on both knees was necessary. After his leg was placed in the cast, the accused discussed with the "people" at the brig the "condition of . . . [his] leg."

They "kept prolonging" a decision "to see what would happen in the court-martial; whether . . . [he] got sentenced, or what would happen." In the meantime, he participated to a limited extent in the routine activities. He could not "walk to chow" so his food was brought to him "cold." On February 28, a memorandum was published to advise brig personnel that the accused would do "no marching, [and] may not go to show [sic] until further notice." The brig officer was not asked, and he did not say, nor is there any evidence to show, why this memorandum was promulgated. In view of the brig officer's testimony that such notices were "always based upon the excuse slip or the advice of a medical doctor," it may be inferred the accused visited the doctor between February 21 and February 28, and that the doctor expressly excused the accused from marching. The cast, as we observed earlier, was still on the accused's leg at the time of trial, March 5, 1963.

Some of the accused's complaint of cruel treatment is not supported by the evidence. For example, there is no apparent connection between the brig routine and the accused's stomach trouble. Also, there is no evidence of any deliberate attempt to deprive the accused of medical attention when he requested it. However, the evidence does establish that the brig ■■■■■■ ■ program aggravated a latent weakness in the accused's knees and the resultant condition gave him considerable pain. The condition required that he be relieved from participation in all phases of the brig program, including marching to the mess hall for his meals. If we credit the accused's testimony, the condition of his knees was so bad that an operation would be necessary to correct it. Whatever may be said about this lamentable deterioration of the accused's physical condition, and about that we shall have something more to say presently, it had no effect upon accused's ability to defend against the charges. It did not dull his memory about the past, or his awareness of the present. See People v Prosser, 309 NY 353, 130 NE 2d 891 (1955). Whatever fault may be assessed for the accused's present plight, there is no discernible nexus between the conditions of his confinement and his preparation for trial. Consequently, had this evidence been fully taken into account by the law officer, it could hardly have influenced his decision. Cf. United States v Vaughan, 3 USCMA 121, 11 CMR 121. The other evidence, which we need not set out at length, shows the Government acted diligently to complete the preliminary proceedings and bring the accused to trial. We conclude, therefore, that if the law officer erred in the matter, the error did not prejudice the accused. United States v Walbert, supra.

Turning to his plea of guilty, the accused contends it was improvidently entered. The meaning and effect of the plea of guilty was explained by the law officer in a preliminary out-of-court hearing. The accused told the law officer he had "discussed" the elements of the offense with his counsel, and he knew what the Government was required to prove. Yet, during the sentence proceedings, the accused said in an unsworn statement that he "didn't have any intentions of depriving anybody in any way when . . . [he] wrote these checks." At the end of accused's statement, the law officer held a second out-of-court hearing. He directed defense counsel's attention to the apparent disclaimer by the accused of any intention to defraud. He also observed such a disclaimer was inconsistent with the plea of guilty in that it denied the existence of one of the elements of the offense charged. His explanation was accepted by defense counsel as "quite correct." Counsel then moved to strike the accused's statement about his intentions. The accused stated his personal agreement with the motion. The law office recommended, however, that the accused talk privately with his lawyers about the matter. The hearing was recessed. Almost a quarter of an hour later, it was resumed; it continued as follows:

"IDC: May it please the law officer, the accused wishes at this time to withdraw all prior statements re-

garding the intent at the time of the issuing of the checks involved.

"LO: Is this your intent, Broy?

"ACCUSED: Yes, sir.

"LO: Is this satisfactory with trial counsel? Do you have any objections?

"TC: This is satisfactory provided that it is stipulated that it will be withdrawn in front of the court, and the court instructed by the law officer that they are to disregard the portion which has been stricken.

"LO: I think it should be done in open court."

When the court-martial reconvened, defense counsel repeated the defense motion to strike from accused's statement that part relating to his intention. Again, the accused personally stated his agreement with the motion. The law officer thereupon instructed the court members to disregard the unsworn statement of intention. In closing argument, defense counsel made the following remarks about the accused's state of mind:

". . . However, if the guy intended to make it good with cash after he wrote the checks, and he didn't have any account, and there's no doubt about it that he did intend to pay it off in cash, and if he hadn't been locked up for being over the hill, perhaps they would have been paid off in cash. I don't know, I can't figure his mind."

Accused's personal participation in the proceedings leaves no room to doubt that he understood the intent element of the offense charged. With that understanding he, and his counsel, twice admitted there was no purpose or desire to detract from the judicial confession that the accused possessed the intent charged at the time he negotiated the checks, which was implicit in the plea of guilty. Cf. United States v Henn, 13 USCMA 124, 32 CMR 124. Appellate defense counsel contend, however, that defense counsel's remarks in closing argument show there was actually no intent to defraud. These

remarks, they say, support the present contention that the plea of guilty was improvident. A careful reading of defense counsel's sentence argument suggests he intended to convey only the idea that after the checks were negotiated the accused decided to make restitution. Assuming, however, the argument can be construed as a qualified denial of the intent required for the offense, in light of the earlier discussion with the law officer of the specific point in issue, it constituted merely "advocate's oratory, not a statement of fact or reasonable belief." United States v Hinton, 8 USCMA 39, 42, 23 CMR 263; cf. United States v Fernengel, 11 USCMA 535, 29 CMR 351.

Despite the weight of the record evidence against the present claim of improvidence of plea, the accused filed with his appeal an affidavit in which he details several efforts to obtain money for the apparent purpose of covering the bad checks. He maintains, among other things, that he attempted to obtain the cash surrender value of an insurance policy, and to deposit the money in his "account." Also, he alleges that as to the check of October 22, which was issued in California but drawn on a bank in Nebraska, he "figured" it would take about "10–14 days before it reached the bank"; he "intended to make a deposit from my pay on payday." The latter representations apparently refer to a Nebraska bank account, which had been closed two years earlier. Apart from material differences between the accused's present assertions and the pretrial evidence available to the Government and on which the accused probably based his decision to plead guilty, significantly, the accused says nothing about the six checks he drew on a California bank in which he had no account. Nowhere in his affidavit does the accused say directly and simply that at the time of the issuance of the checks he did not intend to defraud the respective payees. The same studious avoidance of a direct and unequivocal denial of an intent to defraud appears in a pretrial statement by him which is part of the

426

Article 32 investigation record. In the light most favorable to him, the affidavit shows nothing more than what his counsel argued at trial, namely, that after the offenses, the accused desired to make restitution. That purpose is not inconsistent with guilt. See United States v Clay, 11 USCMA 422, 29 CMR 238; United States v Sellers, 12 USCMA 262, 275, 276, 30 CMR 262. We agree with the board of review, which also considered the matter, that all the evidence shows the plea of guilty was provident.

The last issue within our grant of review deals with the delicate and difficult question of the adequacy of accused's representation at trial as to the sentence. The accused's affidavit, and some letters in the appellate papers, go beyond the issue and imply that both civilian counsel and appointed military counsel grossly misunderstood the legal significance of the evidence available to them regarding the accused's intention to make certain deposits to his "account." See United States v Henn, supra. We examined this evidence in connection with the claim of improvidence of plea. We found it wanting in that regard. It is similarly unpersuasive as a challenge to the professional judgment and competency of defense counsel in connection with the findings of guilty.

Defense counsel's trial responsibility to the accused does not end with the findings. His obligation to provide effective assistance continues through the imposition of sentence. That obligation is not satisfied by obtaining before trial the agreement of the convening authority to disapprove so much of the sentence as exceeds a specified maximum. In United States v Allen, 8 USCMA 504, 508, 25 CMR 8, we observed:

". . . Whatever practical comforts he may have drawn from the preliminary agreement with the convening authority, defense counsel did not provide the court-martial with anything from which it could determine a just sentence. Neither did he provide anything from which a board

of review could reach an informed judgment as to the appropriateness of the sentence affirmed by the convening authority. In reviewing the sentence, the board of review 'can be compassionate; it can be lenient; it can be forbearing,' but it can act only on the basis of what it finds in the record. United States v Lanford, 6 USCMA 371, 378, 20 CMR 87. If there is nothing of substance in the record, there is little that the board of review can do to carry out its sponsibility."

Government counsel point to the examination of the accused conducted by civilian counsel as evidence of his professional skill. The examination sharply contrasted the accused's unhappy civilian background with his military achievements. It amply demonstrates that counsel's representation was not a mere "ridiculous and empty gesture." United States v Hunter, 2 USCMA 37, 41, 6 CMR 37. That, however, is not the measure █ of counsel's responsibility. The fact that counsel's effort rises above the level of the "ridiculous" does not necessarily mean the accused was accorded such effective assistance as assured him a fair trial. It is also incumbent upon counsel to "present such evidence as is known and is available to him, which would manifestly and materially affect the outcome of the case." United States v Rosenblatt, 13 USCMA 28, 29, 32 CMR 28; United States v Hamilton, 14 USCMA 117, 33 CMR 329.

None of the evidence of the brig program and its effect upon the accused, which had been elicited in the out-of-court hearing on the motion to dismiss, was presented to the court-martial. Government counsel maintain the evidence reveals the accused as a "gold bricker"; consequently, keeping the evidence from the court-martial "benefited" the accused. Our earlier discussion of this evidence requires rejection of that approach.

There is no blinking the fact that participation in the brig program activated and aggravated a latent knee condition to the point where it caused

the accused substantial pain, and necessitated an operation. There is no blinking the fact that for two weeks the accused was compelled to eat cold food because he could not march to the mess hall, and the brig officials gave every indication of allowing this situation to continue as long as the accused remained physically incapacitated.

Defense counsel described the accused's treatment as "cruel and unusual punishment." Yet, he did not introduce any of the evidence to the court-martial; nor did he say a word about it. It may be counsel's description was overdrawn, but indisputably the accused suffered physically and mentally as the direct result of the skepticism with which the brig personnel treated his complaints of pain. They were extraordinarily insensitive to his plight. There may indeed be little room for culinary niceties in a brig, but the degree of official indifference to accused's physical inability to march to the mess hall for his meals borders on the malevolent. The "cold meal" routine and the intransigent insistence on the letter of the medical excuses received by the accused, tend to indicate that these were means of punishing the accused for not being well enough to participate fully and satisfactorily in the "strenuous" brig program. In our opinion, there is a fair chance that had this evidence been presented to the court-martial it would materially have influenced its deliberations on the kind and amount of punishment to impose upon the accused. See United States v Huff, 11 USCMA 397, 29 CMR 213; cf United States v Schalck, 14 USCMA 371, 34 CMR 151.

The decision of the board of review as to the sentence is reversed. A rehearing thereon may be ordered.

Judges FERGUSON and KILDAY concur.