UNITED STATES, Appellee

v

WILLIAM C. WALKER, Private First Class,
U. S. Army, Appellant

21 USCMA 376, 45 CMR 150

*Captain John D. Lanoue* argued the cause for Appellant, Accused. With him on the brief was *Colonel George J. McCartin, Jr.*

*Lieutenant Colonel Ronald M. Holdaway* argued the cause for Appellee, United States. With him on the brief were *Colonel David T. Bryant* and *Captain William A. Smith, III.*

## Opinion of the Court

QUINN, Judge:

The accused stands convicted of unpremeditated murder in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918. On this appeal he contends his civilian counsel accorded him inadequate representation at trial.

Government counsel and appellate defense counsel disagree as to the standard by which to assess civilian counsel's representation of the accused. The former maintain that the test of inadequacy is whether the representation was so ineffective "as to constitute a ridiculous and empty gesture." United States v Hunter, 2 USCMA 37, 41, 6 CMR 37 (1952). The latter delineate a higher standard of performance structured on later cases such as United States v Broy, 14 USCMA 419, 427, 34 CMR 199 (1964), in which this Court observed that the "fact that counsel's effort rises above the level of the 'ridiculous' does not necessarily mean the accused was accorded such effective assistance as assured him a fair trial." Disagreement also exists as to whether a single standard applies both to counsel selected and paid by the accused and counsel appointed to represent him. Compare Hendrickson v Overlade, 131 F Supp 561, 562 (ND Ind) (1955), with United States v Broy, supra. See also Annotation, Conviction-Incompetency of Counsel, 74 ALR2d 1390.

Recent constitutional developments may call into question the premises of older precedents as to the scope of the right to counsel. Consistent with at least the implications of our approach to the problem in *Broy*, United States

v Kraskouskas, 9 USCMA 607, 26 CMR 387 (1958), and United States v Pointer, 18 USCMA 587, 40 CMR 299 (1969), the Court of Appeals for the Third Circuit has held that, whether a lawyer represents a fee-paying client or an indigent for whom he has been appointed, the standard for assessing the adequacy of his service is "as in other professions . . . the exercise of the customary skill and knowledge which normally prevails at the time and place." Moore v United States, 432 F2d 730, 736 (1970); United States ex rel. Green v Rundle, 434 F2d 1112 (CA3d Cir) (1970). Similarly, although not articulated as principle, in assessing the effectiveness of counsel's representation of the accused in connection with a plea of guilty, the Supreme Court of the United States has spoken of "reasonably competent advice" and "advice . . . within the range of competence demanded of attorneys in criminal cases." McMann v Richardson, 397 US 759, 770–771, 25 L Ed 2d 763, 90 S Ct 1441 (1970). For the purpose of this appeal, we need not resolve the differences between the parties or predict the current of future constitutional principle. We assume that the accused is entitled to the assistance of an attorney of reasonable competence, whether that attorney is one of his own selection or appointed for him.

One of the accused's major allegations of incompetence is that his civilian counsel did not understand that under a charge of premeditated murder, the court-martial could find him guilty of unpremeditated murder or such other lesser homicide offense

378

as the evidence might indicate. Apparently when retained, civilian counsel viewed the probable evidence as demonstrating the absence of premeditation. He concluded that the charge of premeditated murder referred to trial could not be sustained, with the result that no specification would be left upon which the accused could be convicted. As a member of the bar of "all federal jurisdictions," as well as the bar of the highest court of the states of Illinois and Utah, civilian counsel apparently had in mind the not uncommon practice of charging in the same indictment the principal offense and, in a separate count, each lesser included offense that might be raised by the evidence. See United States v Carter, 445 F2d 669 (CA DC Cir) (1971); United States v Welty, 287 F Supp 580 (ED Pa) (1968), reversed, 426 F2d 615 (CA3d Cir) (1970); United States v Sikorski, 21 USCMA 345, 45 CMR 119 (1972). Under that practice, the failure to prove an element of the offense alleged in the principal count would result in acquittal of that count, but conviction could be had on a count setting out a lesser offense. We need not, however, speculate as to civilian counsel's reasoning; the fact of the matter is, he was not uninformed as to the law regarding the right of a court-martial to acquit an accused of the principal offense charged but to convict him of a lesser included offense established by the evidence.

Civilian counsel did not represent the accused by himself. Associated with him, both in preparation of the case and at trial, was appointed defense counsel, Captain Casseaux. Captain Casseaux was an officer in the Judge Advocate General's Corps who had represented the accused at the Article 32 investigation, and had been appointed defense attorney before the accused decided to retain civilian counsel. In an affidavit, submitted by the accused to the Court of Military Review, Captain Casseaux indicates that before trial he discussed with civilian counsel the latter's notion of the consequences of pleading a single specification of premeditated murder. Captain Casseaux advised civilian counsel of the "applicable law" and "encouraged" him not to advance his concept in a motion to dismiss, as he had indicated he would. Civilian counsel "agreed not" to proceed with the motion, but at trial he changed his mind and presented a motion to dismiss.

Obviously, counsel did not act from ignorance. He was simply unwilling to accept what he apparently regarded as unsound law. Too many "well-established" principles of practice and "settled" rules of law have been found, on re-examination, to be deficient or faulty to justify labelling the individual who challenges them, in a proper forum, as an ignoramus or incompetent. See Gideon v Wainwright, 372 US 335, 9 L Ed 2d 799, 83 S Ct 792 (1963); Benton v Maryland, 395 US 784, 23 L Ed 2d 707, 89 S Ct 2056 (1969). In any event, assuming civilian counsel's obduracy on this issue marked him as foolish, the accused had the benefit of appointed defense counsel's wisdom. Both civilian and appointed defense counsel participated in the formulation of instructions on lesser included offenses, and all such offenses raised by the evidence were included in the instructions. Consequently, nothing that transpired in the case as regards the form of pleading and the degrees of guilt considered by the court members affected any substantial right of the accused. Compare Lunce v Overlade, 244 F2d 108 (CA 7th Cir) (1957).

It is further alleged that civilian counsel was grossly unprepared. If counsel did less than he could have, we are not persuaded, either by the accused's recital of alleged omissions not apparent in the record or by counsel's performance as evidenced by the record of trial, to conclude that the accused got less effective representation than a reasonably competent lawyer would have provided.

Again, we refer to Captain Casseaux's active participation in the

case. He had represented the accused at the Article 32 investigation. In his affidavit, he advises that he had conducted an "extensive independent investigation" and had talked with "the witnesses on several occasions." Not only did he turn over to civilian counsel his "entire file" when counsel was retained by the accused, but he conferred with him at least "a couple of times." The accused contends that civilian counsel had indicated it was unnecessary for him to talk with the witnesses independently. However, Captain Casseaux eventually convinced counsel to talk with them. In addition, the accused admits he had at least four interviews with civilian counsel before the trial. The record indicates that civilian counsel and Captain Casseaux conferred during the trial in regard to the examination of the witnesses. Except as to the testimony of Captain Jones, which we will consider later, it is not alleged that any item of evidence favorable to the accused was not introduced at trial because of civilian counsel's neglect. The record itself suggests no such omission. The accused would have us consider civilian counsel's efforts separately from those of appointed defense counsel, but the two constituted the defense team, and their combined efforts constitute the kind of assistance the accused received. See United States v Tellier, 13 USCMA 323, 32 CMR 323 (1962). Captain Casseaux and civilian counsel may have differed as to various aspects of preparation for trial and in regard to phases of the defense case, but, as a team, they were well prepared and worked harmoniously together in the conduct of the trial. See Kennedy v United States, 259 F2d 883 (CA 5th Cir) (1958), certiorari denied, 359 US 994, 3 L Ed 2d 982, 79 S Ct 1126 (1959). We find no merit in this part of the accused's contention of ineffective assistance.

Moving from omission to commission, the accused maintains that he was prejudiced by civilian █ counsel's fruitless attempt to raise an issue of self-defense when no such issue appeared in the evidence known to counsel before trial. At trial, civilian counsel attempted to determine from witnesses to the homicide whether the victim, Specialist Five Thomas, had threatened to kill the accused, shortly before the accused shot him. Evidence at the Article 32 hearing indicated that the accused and Thomas had had a fist fight. According to the accused, the fight had been started by Thomas. Thomas was about 6 feet 1 or 2 inches in height and weighed approximately 250 pounds; the accused was about 5 feet 11 inches tall and weighed 165 pounds. A bystander indicated that after the fight had ended, words passed between the accused and Thomas. He heard only some of the conversation, and when the accused had started to walk away from the area, "Thomas followed him for a few feet." At his psychiatric examination, the accused told Dr. Jones that as he walked away, he felt "dizzy" and saw "red"; he had the "weird" feeling that Thomas was "following" him, but beyond that all he remembered was a rifle "being in his hand." Other evidence indicated that during the fight the accused sustained an injury to the head, which bled profusely, and a gash on his arm. During the fight, Thomas and the accused had fallen to the ground, with Thomas on top. The fight ended when a sergeant pulled Thomas away from the accused.

Considering the circumstances of the fight, it was not unreasonable for counsel to conclude that Thomas might have, in appropriate language, told the accused, as he walked away, something to the effect that the next time he would "beat his brains out."[1] Since he did not know whether a threat of that kind had actually been uttered, counsel might have been less dramatic in phrasing his questions, but the

---

[1] In fact, in a statement considered at the Article 32 investigation, a witness testified to the effect that Thomas told the accused that the next time they fought he should "have something to back . . . [him] up."

point of inquiry was not unreasonable. True, had counsel elicited responses sufficient to raise an issue of self-defense, that defense would have been inconsistent with the defense of insanity, since one contemplates a rational and volitional act whereas the other postulates the inability to know or to adhere to lawful conduct. Inconsistent defenses in a criminal case are, however, permissible and proper. United States v Rine, 18 USCMA 421, 40 CMR 133 (1969), footnote 1; United States v Harbin, 377 F2d 78, 80 (CA 4th Cir) (1967).

In his opinion in United States v Hubbard, 13 USCMA 652, 654, 33 CMR 184 (1963), Judge Kilday observed that a defense counsel who elects to proceed on "a theory and strategy" he believes will serve "the best interest of the accused" should not be condemned because the course of action he chose did not produce favorable results for the accused. If success in matching result with effort were the sole measure of the effectiveness of counsel's assistance, every conviction would have to be reversed. As we view civilian counsel's effort to determine whether the decedent had threatened to kill the accused, we perceive no risk of harm to the accused.

Appellate defense counsel charge civilian defense counsel with "poor presentation and misuse" ▆▆▆▆▆■ of the psychiatric testimony available to the defense. Dr. Jones, a psychiatrist and Chief of the Mental Hygiene Clinic at the USARV Stockade, examined the accused at Captain Casseaux's request. Dr. Jones reported that while he had classified the accused as emotionally unstable, he found no evidence of "psychiatric disease or defect." He further reported that in his opinion the accused could distinguish between right and wrong and could adhere to the right "concerning the particular acts charged." He was also of the opinion that the accused could understand the nature and seriousness of the charges and the proceedings against him, and could intelligently cooperate in his defense. Notwith-

standing the discouraging nature of the report as a basis for a defense of lack of mental responsibility, civilian counsel called Dr. Jones as a defense witness.

Under questioning by counsel, Dr. Jones admitted that the findings set forth in his pretrial report were reached without benefit of "any psychological tests," and were set out as "the Army, in terms of its set-up considers this to be," but that "from a psychiatric point of view . . . it really isn't black and white." As to his personal "feeling" about the accused's mental condition, Dr. Jones testified that "at best" it "would have been very difficult" for the accused to distinguish right from wrong at the time of the offense. He acknowledged that his personal opinion was that the accused's anxiety at the time of the shooting was "so overwhelming" that his "reasoning powers" were "fragmented" to the "extent" that he was incapable of "premeditation and intent."

How it can legitimately be argued, in face of the trial testimony of Dr. Jones, that civilian counsel's presentation of the psychiatric evidence was "poor" and misused escapes us. Granting that the form of counsel's examination was not as polished as that of a lawyer skilled in the discipline of psychiatry, the evidence he developed at trial as to accused's mental condition was immeasurably more favorable to the accused than the information contained in Dr. Jones' pretrial report.

Finally, the accused contends that his "doom was sealed" by atrocious closing argument. See United States v Walker, 3 USCMA 355, 12 CMR 111 (1953). Civilian counsel's argument covers fourteen pages of the record of trial. It reviewed the evidence of each witness and called attention to alleged deficiencies and inconsistencies. In several ways and at several places, counsel contended that in shooting the victim, a matter which was incontrovertible, the accused was "incapable of actually distinguishing between right and wrong, or to form

**381**

an intent." He argued that the evidence "was grossly inadequate" to prove intent and that the accused should "be held not guilty of the offense alleged against him." He concluded with the following remarks:

". . . I have a couple of closing thoughts, one of which I don't like to make. But, I'm afraid in this case it's seemingly most apparent that it should be made, and that is to call your attention to the fact that the prosecuting attorney will call for the maximum punishment in this case. It is not necessary, gentlemen, why he should. Why this case was ever declared a capital case is beyond me. But as the judge would inform you, you are the ones who make the final determination. And your analysis, regardless of the scale that goes through in connection with considering these things, you are the ones who can decide that you do not have to punish this man at all. And I sincerely request you to return a verdict of not guilty and acquit the man. As a final reminder, and I think this is totally unnecessary, but there are good words coming from the seventh page of *The Book of Common Prayer*, quote, 'Almighty God, the Father of our Lord, Jesus Christ, who desireth not the death of a sinner, but rather that he may turn from his wickedness and live.' I ask your kindest consideration for William Walker."

Appellate defense counsel view the quoted remarks as damaging to the accused in three respects. First, they contend that the remark about reference of the charge to trial as a capital case could be construed by the court members as indicating that the convening authority had determined that the case was "so damning" as to justify a death sentence. We may assume that senior officers are not totally ignorant of the broad outlines of military law and court-martial procedure. See United States v Seay, 13 USCMA 540, 544, 33 CMR 72 (1963); compare United States v Keith, 1 USCMA 442, 4 CMR 34 (1952). We would suppose they might know that premeditated murder is a capital offense, but we are not at all sure they would be so well versed in military law as to know that a convening authority can order a capital offense to be tried as noncapital. See Article 18, Code, supra; Manual for Courts-Martial, United States, 1969 (Revised edition), paragraphs 15 and 33j. However, even if we attribute such knowledge to all the court members, they also had to know that the evidence before the convening authority when he referred the case to trial was substantially different from the evidence before them. If nothing else, they knew from Dr. Jones' testimony that the evidence probably considered by the convening authority gave no indication of a serious question as to the accused's mental condition, but on the evidence before them that issue was in substantial dispute. We conclude, therefore, that no fair risk of prejudice to the accused could result from civilian counsel's reference to the case as capital.

The two remaining aspects of appellate defense counsel's criticism of civilian counsel center on the remarks that the court did not "have to punish this man at all," and although a "sinner" the accused should be allowed to turn from "his wickedness and live." These remarks are perceived as a concession of the accused's guilt. The *Walker* case is cited in support, but it is inapposite.

Counsel's remark about not punishing the accused is inseparable from the next sentence which refers to a verdict of not guilty. For fourteen pages, counsel had argued a legitimate basis for that kind of verdict. We are unpersuaded, therefore, that the no-punishment comment was an implied concession of guilt. In context, it impresses us as a plea not to punish the accused just because he killed, but to absolve him of liability because he was not mentally responsible for the act.

As to the quotation from The Book of Common Prayer, we discern no basis from which it could reasonably be regarded by the court members as

a concession of guilt of murder. To us, it is an appeal for a moral consideration of the evidence, rather than a vindictive one, in which the accused's life must be taken for the victim's life. This construction is consistent with civilian counsel's "final reminder" that the quotation was "totally unnecessary." The court members knew they were sworn to decide the accused's guilt on the basis of the evidence before them. Earlier in his argument, counsel had expressed his certainty that they would "use their very fine judgment in deciding" the issues, and that they would "interpret the evidence" as they saw it, not as counsel did. In the light of counsel's whole argument, it is inconceivable that the court members would consider this final quotation, described as "totally unnecessary," as an abandonment of the plea of not guilty and of all of counsel's argument for an acquittal on the ground of the accused's inability to adhere to the right or to possess the intent required for murder.

We are satisfied that the accused received adequate and effective assistance of counsel. The accused was convicted, but it was on the evidence, not as a result of any professional deficiency on the part of his counsel. Accordingly, we affirm the decision of the United States Army Court of Military Review.

Chief Judge DARDEN concurs.

Judge DUNCAN concurs in the result.