UNITED STATES, Appellee

v

CLINTON A. SMITH, Airman Basic,
U. S. Air Force, Appellant

17 USCMA 55, 37 CMR 319

No. 19,856

June 2, 1967

*Lieutenant Colonel Carl R. Abrams* argued the cause for Appellant, Accused. With him on the brief was *Colonel Joseph Buchta.*

*Colonel James R. Thorn* argued the cause for Appellee, United States. With him on the brief were *Colonel Emanuel Lewis* and *Lieutenant Colonel David B. Stevens.*

QUINN, Chief Judge:

On Monday morning, January 31, 1966, a routine inspection of the nuclear casualty kit located in Building 3509, Retraining Group, Amarillo Air Force Base, Texas, disclosed that the outer seals had been broken. The base medical supply officer was immediately called to the scene. He examined the contents of the kit, and concluded that 100 syrettes of morphine had been removed.

Agents of the Office of Special Investigations investigated the matter. They interrogated a number of persons who had been on duty in the building during the weekend as Charge of Quarters. Among these was the accused. He admitted that during his tour of duty he cut the seals and opened the kit; he also admitted he removed the morphine syrettes and took them to his room. However, when, on Monday morning, he learned the theft had been discovered, he flushed part of the syrettes down the toilet and "dumped" the remainder about two blocks from his barracks.

A charge of larceny and one of wrongful possession of morphine were made against the accused and referred to a general court-martial for trial. At trial, he entered a plea of not guilty but was convicted as charged, and sentenced to a bad-conduct discharge, forfeiture of all pay and allowances, and confinement at hard labor for two years.

The case came up for trial on June 2, 1966. Before the accused's plea, defense counsel moved to dismiss the charges on the ground the accused was denied a speedy trial. No testimony or documentary evidence was introduced, either for or against the motion. Cf. United States v Batson, 12 USCMA 48, 51, 30 CMR 48. However, in the course of his argument, counsel indicated the accused had been confined from February 3, to April 7, a period of 63 days, and that 119 days had elapsed since the accused admitted his guilt to the Office of Special Investigations agents. He contended the command had "no excessive case load" and "no reason for this delay" existed. In opposition, trial counsel argued that the "confession alone" was insufficient to sustain a prosecution and, consequently, there was an investigation for "supporting evidence." He represented that the investigation, particularly ascertainment of the contents of the kit, "took quite a bit of time and required numerous phone calls and several letters" between the Air Base and the Army Depot in Lathrop, California, from which the casualty kit had been obtained. He also asserted that "everything" was not "firmed up" until approximately three weeks before the date of trial; and thereafter problems were encountered in "procuring the members of the court and the law officer."[1] The law officer denied the motion.

Relying upon United States v Brown, 10 USCMA 498, 28 CMR 64, the accused contends the law officer erroneously placed upon him the burden of proving he was denied a speedy trial. The contention is anchored on certain comments by the law officer during argument on the motion to dismiss. The first remark was made after assistant defense counsel referred to the length of the accused's confinement. At that point, the law officer inquired whether the accused had "been injured thereby in any way." Assistant defense counsel answered that "prejudice" resulted from the mere circumstance of the accused's confinement. Thereupon the law officer inquired into the accused's status in the Retraining Group, and asked whether he wasn't, by virtue of his assignment to the Group, already under a "form of confinement." Assistant defense counsel replied that at

---

[1] The record also indicates that a law officer other than the one who sat was originally appointed. He was replaced by the sitting officer only a week before the trial. The latter was regularly assigned to Webb Air Force Base, Texas, but, with the concurrence of his commander, was appointed as law officer of the court-martial at Amarillo. See Manual for Courts-Martial, United States, 1951, paragraph 4f.

the time of the alleged offenses the accused was out of his "confinement status" and was "awaiting restoration to duty." The second comment was made after both counsel had concluded their arguments. It is as follows:

"LO: Is there any further evidence which either trial or defense counsel would like to submit to the law officer before he makes a ruling on this motion?

"DC: The defense would like to question the last statement, the previous statement, by the prosecution with regard to letters being written. Does he actually know of any letters, and what dates they were written, to secure information with regard to the contents of the survival kit?

"TC: I can get them or find out the dates, sir. Offhand I do not know what they are. As I said, I wasn't conducting that part of the case.

"DC: I would think it would be relevant to determine if anything was being done at this time to require such a delay, and the actual times and dates be established.

"LO: I don't feel it's essential that we question it. I am sure the trial counsel is correct that because of the nature of the material in this case it was necessary to contact the depot in order to get information pertaining to the contents thereof, and this information may not have been returned to this base as rapidly as other types of information. The law officer does not see a serious injury having been done to the accused as a result of this delay, and therefore the law officer will overrule the defense motion. Would you call the court back in?

"TC: Yes, sir."

Military law recognizes the right of an accused to a speedy trial. United States v Williams, 16 USCMA 589, 37 CMR 209. It also recognizes, as appellate defense counsel contend, that the burden is on the Government to justify delays in the prosecution. United

States v Lamphere, 16 USCMA 580, 37 CMR 200; United States v Brown, supra. However, we discern nothing in the law officer's comments to suggest he misconceived either or both of these principles. Cf. United States v Berry, 6 USCMA 609, 613, 20 CMR 325. An apparently satisfactory explanation for a particular delay might be revealed as unreasonable in the light of specific harm to the accused occasioned by the delay. United States v Broy, 14 USCMA 419, 421–422, 34 CMR 199; Woody v United States, 370 F2d 214 (CA DC Cir) (1966); cf. United States v Hammond, 360 F2d 688 (CA2d Cir) (1966), certiorari denied, 385 US 918, 17 L ed 2d 142, 87 S Ct 227 (1966). It is thus always relevant to consider the actual consequence to the accused of any interruption in the proceedings against him. See Jackson v United States, 351 F2d 821 (CA DC Cir) (1965). Consequently, inquiry into the matter does not itself indicate the law officer misunderstood or misapplied the burden of proof. The plain fact is that the law officer *did require* the Government to furnish reasons for the delay. He did not, as the law officer did in the *Brown* case, require the accused to establish specific prejudice as a precondition to a "determination of whether or not the lapse of time was due to purposeful or oppressive design . . . or to a lack of reasonable diligence." United States v Brown, supra, at pages 503–504. Certainly, a more detailed record would have been developed if the law officer had granted trial counsel's implied request for a continuance to "find out the dates" of the written correspondence with the Army Depot. And, it is certainly desirable that the evidence in the record of trial be as complete as possible. United States v Williams, 12 USCMA 81, 83, 30 CMR 81; United States v Tibbs, 15 USCMA 350, 35 CMR 322. See also Torvestad, "Speedy Trial in Military Law," 8 USAF JAG Law Rev, May-June 1966, at page 37. However, the sufficiency of the evidence for the purpose of a ruling is one thing; the law officer's understanding as to which party has the burden of the proof is another. Our reading of the record of trial leaves us

with an abiding conviction that the law officer knew and applied the correct rule.

At trial, defense counsel contended that, apart from the accused's confession, the evidence was insufficient to establish probable commission of the offenses charged. The contention was overruled. It is reiterated here. See United States v Schoenberg, 16 USCMA 425, 427, 37 CMR 45.

There is abundant evidence establishing that the casualty kit was cut open without authority sometime between Friday, January 28, and Monday morning, January 31, 1966. On Friday, the kit had been inspected, as it had been every weekday for a period of years. No sign of material injury to, or tampering with, the seals had been found. However, in the Monday inspection it was discovered that the seals had been cut and a metal band around the center of the kit had been loosened and moved. The evidence further shows that several cartons inside the kit had also been cut open. Nothing was removed from the kit from the time of the inspection until it was examined by the base medical supply officer. He testified he examined the contents of the kit and could not find 100 syrettes of morphine, which, according to regulations governing the program for casualty aid, should have been in an inner carton. Printed on the exterior of an inner carton labeled "Master Pack (Misc)" was the legend "Components." A number of articles were listed under the legend by military stock number and common name. Among these were 100 morphine syrettes. Appellate defense counsel concede all this, but contend the evidence is insufficient to establish the probable presence of the syrettes in the kit when it was originally packed and sealed.

No direct evidence indicates the syrettes were placed in the kit before it was sealed. However, "circumstantial, as well as direct, evidence may be considered" to establish the probable existence of a fact. United States v Snearley, 15 USCMA 462, 463, 35 CMR 434. A number of items in evidence bear upon the point. The first, and perhaps most significant, is Prosecution Exhibit 13. The exhibit is as follows:

| (6545–559–6105 | | | | | |
|---|---|---|---|---|---|
| EMERGENCY MEDICAL TREATMENT UNIT, PHASE I DETERIORATING AND/OR POTENCY DATED ITEMS | | | | | |
| | | | | SERIAL NR SU–Z31703 | |
| Packed in | Stock Nr | Manufacturer | Lot Nr | Date of Mfg | Exp Date |
| Master Pack (Dextran) | 6505–116–1890 | Baxter Lab | 283x 6C | 11/52 | n/a |
| Master Pack (Misc) | 6505–129–5517 | E. R. Squibb & Sons | 9 M49474 | | |
| Master Pack (Misc) | 6505–299–8276 | Chas. Pfizer & Co. | 05016 | 7–59 | 10–1–65 |
| NOTE: This form is to remain with this Phase I Unit at all times. | | | | | |
| | | | | | I.O. Ex 4 |

Prosecution Exhibit 13 was admitted in evidence with an affirmative statement by defense counsel that the defense had "no objection" to it. The accused now contends the exhibit should not be considered because "the record fails to reveal where . . . [it] came from." Captain Donald T. Nielsen, the base medical supply officer, identified the exhibit. He testified the completed form "came with the kits originally." It further appeared that the regula-

tion governing the program provided that a list of dated items packed into a kit would be "posted on the outside of the set containers," and be periodically examined to assure their renewal before expiration of the respective potency periods. AF Pamphlet No. 167–2–1, paragraph 11a(3), page 5, August 31, 1961. It was also established that the serial number in the upper right corner of the exhibit corresponded to the serial number of the kit; that the stock number 6505–129–5517 noted in the exhibit for morphine syrettes matched the stock number of the morphine syrettes printed on the inner carton of the kit which, by regulation, was supposed to contain the syrettes. Finally, the inner carton which was supposed to contain the syrettes was one of those on which the seals were found to be cut open.

A second item of evidence bearing upon whether the morphine syrettes were packed into the kit is the list of contents on the outside of the carton. Appellate defense counsel contend the list has no probative value because it is printed; and, logically, the printing had to be done before the carton was packed. There is evidence to the effect that the kits were received from Sharpe General Depot, Lathrop, California, in a sealed, undamaged condition.

Common experience indicates that the contents of a sealed original package are "as indicated by the label." Interstate Life & Accident Insurance Co. v Whitlock, 112 Ga App 212, 144 SE2d 532, 536 (1965) ; see also United States v Conlon, 14 USCMA 84, 88, 33 CMR 296. The inference of identity between label and content is strengthened when, as here, the obligation to pack the article and affix the label is required by law. Consequently, whether the packaging of the kit is considered an "official act," because it was part of a Government program, or merely as a routine business practice, in the absence of contrary evidence, it may properly be inferred that it was correctly performed. United States v Moore, 8 USCMA 116, 23 CMR 340; Clark v Citizens National Bank of Collingswood, 38 NJ Super 69, 118 A2d 108, 112 (1955).

Whether any one of the items of evidence to which we have referred would by itself be sufficient to indicate the probable presence of the morphine syrettes in the casualty kit need not detain us. We have no doubt that together they demonstrate the probability of that fact.

It is well settled that the corroborative evidence requirement does not extend to the identity of the offender. It is sufficient if the evidence shows the offense was probably committed by someone. United States v Villasenor, 6 USCMA 3, 6, 19 CMR 129, reaffirmed in United States v Smith, 13 USCMA 105, 32 CMR 105. However, appellate defense counsel contend that in a narcotic prosecution the independent evidence must also establish the probable identity of the accused as the wrongdoer. The argument relies heavily upon United States v Mims, 8 USCMA 316, 24 CMR 126, but Mims is inapplicable.

In Mims, the accused was one of several patients in an Army hospital ward. Each patient occupied a separate bed, and the area around his bed was separated from that of each of his neighbors by partitions. A search of the ward by an Office of Special Investigations agent uncovered narcotic paraphernalia in the area of a patient several beds removed from the accused. Under interrogation by the agent, the accused admitted that on the previous day he had injected himself with heroin. The Court held that evidence of the possession of narcotic implements by one patient does not "raise any kind of an inference that a third party occupant of a hospital ward was probably making use of the equipment." Id., page 318. The Court, therefore, concluded that the independent evidence was insufficient to corroborate the accused's confession. See also United States v Aloyian, 16 USCMA 333, 343, 36 CMR 489. Here, the logical inference is that the person who cut open the casualty kit was also the person who had possession of the morphine. There is, therefore, no gap between the corroborative evi-

dence and the accused's confession to the narcotic charge.

In his last assignment of error, the accused contends the law officer erred in his instructions on the period of confinement to which he could be sentenced. The law officer instructed the court members that the maximum confinement was six years. Apparently, he contemplated that the accused could be separately punished for larceny, which carries a maximum confinement of one year, and for the narcotic offense, which carries a five-year confinement term. Table of Maximum Punishments, Manual for Courts-Martial, United States, 1951, paragraph 127c, Section A, pages 223, 225. Appellate defense counsel maintain that the two offenses are not separate for the purpose of punishment.

The problem of the separateness of several offenses committed in the course of a single incident or transaction is a recurring one. · See United States v Modesett, 9 USCMA 152, 153, 25 CMR 414. It has so frequently come up for decision that it has been suggested the military readopt the Army rule in effect before the Uniform Code of Military Justice, which provided that an accused found guilty of two or more offenses "constituting different aspects of the same act or omission" be punished only with "reference to the act or omission in its most important aspect." Manual for Courts-Martial,· U. S. Army, 1949, paragraph 80, page 80; United States v Johnson, 5 USCMA 297, 299–300, 17 CMR 297.

At the heart of the issue is the principle that an accused shall "not be twice punished for the same offense." United States v Posnick, 8 USCMA 201, 203, 24 CMR 11. Application of the rule depends upon whether Congress intended to make each step in a single transaction separately punishable. United States v Collins, 16 USCMA 167, 168, 36 CMR 323. In the absence of clear-cut Congressional intention, the courts have followed a "policy of lenity." Ladner v United States, 358 US 169, 177, 3 L ed 2d 199, 79 S Ct 209 (1958). Essentially, the same idea is expressed in the Manual's observation that "[o]ne

transaction, or what is substantially one transaction, should not be made the basis for an unreasonable multiplication of charges against one person." Manual for Courts-Martial, United States, 1951, paragraph 26b.

As the accused views the record, the same evidence establishes both offenses. He argues that such singleness of proof demonstrates that the two offenses are one for the purpose of punishment. United States v Modesett, supra; see also United States v Redenius, 4 USCMA 161, 15 CMR 161. The argument, however, is too narrowly focused.

In some situations, a legislative purpose is apparent to make two acts separately punishable, although one act is part of the other. This is true in a prosecution for conspiracy to commit a substantive act and for commission of the substantive act itself, in which the latter is also alleged as the overt act in the conspiracy count. Callanan v United States, 364 US 587, 5 L ed 2d 312, 81 S Ct 321 (1961) ; United States v Yarborough, 1 USCMA 678, 5 CMR 106. It is also true in a prosecution for the manufacture and possession of counterfeit engraving plates for currency; although possession is necessarily involved in an act of manufacture, the accused can be separately punished for each aspect of the transaction. United States v Michener, 331 US 789, 91 L ed 1818, 67 S Ct 1509 (1947), reversing, 157 F2d 616 (CA8th Cir) (1946). As a matter of fact, the *Michener* case points up the existence of a special legislative intention to punish each step in transactions dealing with contraband articles. See also Gore v United States, 357 US 386, 2 L ed 2d 1405, 78 S Ct 1280 (1958). We have considered that circumstance in a situation substantially similar to the one now before us. In United States v Oakley, 11 USCMA 529, 29 CMR 345, the accused was held punishable for both larceny and wrongful possession of a Government identification card issued to another. The evidence indicated the accused stole a wallet containing a money order and the identification card. Several days after the theft, he used the card as security for

payment of a debt. Subsequently, he was charged with larceny of the money order and possession of the identification card, in violation of the provisions of 18 USC § 701 which prohibited unauthorized possession of an identification card issued by an agency of the United States to an employee or officer thereof. In material part, we said:

"While in the case at bar wrongful possession of the identification card was effectuated at the time the accused obtained possession of the wallet, that is the beginning of the crime alleged and not necessarily the end. Had the Government alleged the crime as the theft of the identification card, the contention might be valid but we are here concerned with possession some seventeen days after the larceny. As previously stated, Congress has seen fit to pass legislation proscribing the wrongful possession of identification cards. We generally outlined the reasons for making this offense punishable and the purpose of the legislation is to prevent the serious consequences which may flow from the wrongful use of the identification card. The probability of damage to the services continues to exist so long as the card is illegally possessed. In view of the statutory prohibition and the governmental function to be protected, it can be said that such cards take on the properties of contraband, and their possession at any time is unlawful. In this sense the offense is continuing, and prosecution is not barred merely because an accused is tried for an allied offense involving illegal acquisition of other property taken at the same time. Under that theory, a thief who possessed counterfeit money would be insulated from punishment for its possession if he had been tried for larceny of other goods which were stolen at the same time as the spurious contraband money." [United States v Oakley, supra, page 533.]

More recent cases have not undermined *Oakley's* rationale. These have utilized the "working rule" (*Modesett,* supra, page 153) that mul-

tiple offenses are generally not separately punishable if the evidence to support a conviction on one charge will also support a conviction on the others. United States v Scott, 16 USCMA 478, 37 CMR 98; United States v Collins, supra; United States v Kleinhans, 14 USCMA 496, 34 CMR 276. However, even from the standpoint of sameness of proof, the offenses here are sufficiently separate in time and circumstance to be separately punishable. Although the specifications indicate the offenses were committed on or about the same date, the identity of time is not determinative of the question of punishment. United States v Taglione, 9 USCMA 214, 25 CMR 476; United States v Lowe, 9 USCMA 215, 25 CMR 477. The specifications must be considered "in conjunction with the evidence." United States v Walker, 8 USCMA 640, 642, 25 CMR 144. The accused's pretrial statement indicates he transported the syrettes to his barracks and kept possession of them for almost two days after the theft. This evidence is competent to establish that possession acquired during the theft continued to a place and under conditions different from the larceny. United States v Real, 8 USCMA 644, 25 CMR 148; United States v Lowe, supra. On the evidence, therefore, the possession of the morphine syrettes was different in time and place from the theft; and both offenses are thus separately punishable. United States v Ompad, 15 USCMA 593, 36 CMR 91.

The decision of the board of review is affirmed.

Judge KILDAY concurs.

FERGUSON, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

I agree with my brothers that accused's confession is sufficiently corroborated and that the offenses of larceny and possession of narcotics, in violation of Uniform Code of Military Justice, Articles 121 and 134, 10 USC §§ 921, 934, respectively, are, under the circumstances of this case, separately punishable. I cannot, however, agree with

their disposition of the issue involving speedy trial. I cannot concur with a judicial repeal of Code, supra, Articles 10 and 33, 10 USC §§ 810, 833.

The record indicates the accused was placed in pretrial confinement on February 3, 1966, immediately following his confession of guilt of the offenses on which he was ultimately arraigned. He was released from confinement on April 7, 1966, when his presence without charges was discovered during the course of disposing of a Congressional inquiry regarding another individual. Charges were not placed against him until May 4, 1966, and he was brought to trial on June 2, 1966.

Defense counsel moved to dismiss the charges, based primarily on the failure to prefer charges on a timely basis, and his statement of the foregoing facts was not contested by the Government. Indeed, at this level, the United States concedes such to have been the case.

In rebuttal to the defense presentation, serious difficulties were alleged in securing evidence to corroborate accused's confession, requiring "numerous phone calls and several letters up and back between Amarillo and California." When defense counsel denied such was the case, trial counsel conceded his lack of personal knowledge of the facts, and asked for an opportunity to establish relevant times and dates. The law officer saw no need to obtain such information, ruled there had been no "serious injury . . . done to the accused as a result of this delay," and overruled the motion. Earlier, he had asked defense counsel whether accused had "been injured . . . in any way" by his confinement for 63 days without preference of charges. In reply, counsel quite cogently pointed out:

"I would believe that the injury to the accused has been his being in the guardhouse without charges. I think a man has a right to know what he's charged with. I think a man has a right not to be held if there's no reason for holding him; prejudice to the individual. I think it's an unreasonable confinement for no purpose."

Defense counsel's thoughts accurately reflect what Congress positively provided in the Uniform Code. Thus, it declared, in Code, supra, Article 10:

". . . When any person subject to this chapter is placed in arrest or confinement prior to trial, *immediate steps shall be taken to inform him of the specific wrong of which he is accused and to try him or to dismiss the charges and release him.*" [Emphasis supplied.]

More specifically, it provided in Code, supra, Article 33:

"When a person is held for trial by general court-martial the commanding officer shall, *within eight days after the accused is ordered into arrest or confinement, if practicable, forward the charges, together with the investigation and allied papers, to the officer exercising general court-martial jurisdiction.* If that is not practicable, he shall report in writing to that officer the reasons for delay." [Emphasis supplied.]

When considered by the House Armed Services Committee, these Articles excited considerable attention. See Hearings before House Armed Services Committee on HR 2498, 81st Congress, 1st Session, pages 905–912. Congressman Anderson expressed considerable concern over the delays in prosecution of confined accused which occurred during World War II—"where a fellow was put in the clink and held there for weeks, sometimes months, before he was brought to trial." *Id.,* at page 906. Mr. Felix Larkin, General Counsel, Department of Defense, testified "the combination of [Articles] 33 and 98 is pretty good assurance that the cases will be speedily processed," and "there is great desirability in that." *Id.,* at page 908. To insure that such was the case, Code, supra, Articles 10 and 33 were duly recommended for enactment and passed. House Report No. 491, 81st Congress, 1st Session, pages 13, 20; Senate Report No. 486, 81st Congress, 1st Session, pages 10, 17.

In United States v Brown, 10 USCMA 498, 28 CMR 64, we carefully examined the import of these two statutory provisions, and declared, at page 503:

"From these provisions, read in the light of the intent of Congress as ascertained from the views of the framers of the Code, set out in our opinion in United States v Hounshell, supra, it is clear that *whenever it affirmatively appears that officials of the military services have not complied with the requirements of Articles 10 and 33, supra, and the accused challenges this delict by appropriate motion, then, the prosecution is required to show the full circumstances of the delay.* Of course, an accused is not automatically entitled to a dismissal of all charges against him. Rather, the law officer must decide, from all the circumstances, whether the prosecution has proceeded with 'reasonable dispatch.' United States v Callahan, 10 USCMA 156, 27 CMR 230." [Emphasis supplied.]

In the *Brown* case, the accused was confined on April 13, 1958. Charges were preferred twelve days later and received by the officer exercising general court-martial jurisdiction forty-eight days after his incarceration. This, we held, was sufficient to raise an issue of speedy trial in violation of Articles 10 and 33 and demand an explanation of delay by the Government. Lacking such, we reversed.

The case now before us presents an even more serious picture. Here, the accused was confined for sixty-three days *without the preference of any charges*. He was found in the stockade and released only because of a Congressional inquiry regarding *another prisoner*. And if this is not a sufficient indication on its face of a palpable disregard for duly enacted procedures regarding the prompt disposition of charges, it should be also pointed out that charges were not even preferred until twenty-seven additional days had elapsed, and these were in fact not tried until another twenty-nine days had passed. In short, this accused, though he confessed on the day of his confinement, was not tried thereafter until approximately 119 days had gone by. Were Congressman Anderson to note these figures, how well he might reflect

that the days have not vanished when "a fellow was put in the clink and held there for weeks, sometimes months, before he was brought to trial"! House Hearings, supra, page 906.

Such a flat disregard of the Code's provisions is more than sufficient to place the accused's right to prompt prosecution in issue and to cast upon the Government the burden of explaining away the conceded delay. United States v Brown, supra. Rather than require such, however, the law officer inquired of defense counsel the manner in which this violation of law harmed the accused and, rather than require presentation of an explanation by the United States, ruled that such was not necessary—declaring, "I don't feel it's essential that we question it."

The initial question of the law officer needed no answer, unless the Government believes a man suffers no injury by virtue of illegal imprisonment. He further expressed the view, without the slightest evidence to support it, that he was sure the trial counsel was correct in stating it had been necessary to get further evidence "and this information *may not* have been returned to this base as rapidly as other types of information." (Emphasis supplied.) He found no "serious injury" to the accused "as a result of this delay," and refused to dismiss the charges.

Of course I do not believe, as I did not in *Brown*, supra, that the accused was here entitled to an automatic dismissal of the charges. Under that case and Code, supra, Articles 10 and 33, he was, however, entitled to have the Government explain the circumstances of the delay and to dispel the aura of prejudice which surrounds an incarceration in excess of two months without charges. Though it conceded the defense presentation represented the facts, it offered, as my brothers admit, no evidence in explanation, and trial counsel declared that he had no personal knowledge of the matters. Indeed, as accused's imprisonment was, on the record, accidentally discovered, it would seem there in fact may be no acceptable reasons for this unconscionable breach of the law. In any event, under United

States v Brown, supra, an explanation was required. When the law officer refused to hear any, he committed prejudicial error and a rehearing should be ordered.

Turning to the views expressed in the principal opinion, much of what I have said above indicates the grounds for my disagreement therewith. It asserts no burden was placed on the defendant to show an unjustified delay. But the record shows the contrary. Not only did the law officer look solely to the defense in inquiring whether accused was injured, but he also expressly declined to hear the trial counsel's offer of evidence in explanation. While the Government conceded the truth of the defense's statement and a violation on its face of Code, supra, Articles 10 and 33, it, as the majority concede, presented not the slightest bit of evidence in explanation. Under these circumstances, a clear violation of the principle we enunciated in United States v Brown, supra, occurred, for we there said that, under such facts, it was the burden of the Government to explain the delay. Lacking such, it is obvious the law officer ruled simply on the basis that defendant had not shown he was injured and, hence, there was no need for the Government to explain the delay. In my view, his ruling was clearly and prejudicially erroneous.

I cannot leave this matter without expressing my continuing dismay at the cavalier disregard which has been shown by the armed services for the duly enacted provisions of the Code regarding prompt disposition of charges. This record and others which have come before us indicate the situation has not materially changed from that which led to the enactment of Code, supra, Articles 10 and 33. I am informed that, at one time, it was the services' practice to enforce time limits rigidly and to demand from commanders and staff judge advocates explanations of situations such as exist here. Apparently, these controls have either been discontinued or rendered largely ineffective. I suggest a return to their use. Otherwise, it is apparent that further legislation will be necessary to insure the right of an accused person to speedy prosecution of charges levied against him. Certainly, the Congress will be interested in noting how its mandates are ignored, and I should think the Department of the Air Force would be both embarrassed and ashamed that, in a day of push button warfare and rocketry, an American accused can be locked up in the stockade and forgotten for over two months, without even the preference of charges!

I would reverse the decision of the board of review and remand the case for a rehearing at which the reasons for the delay, if any, might be presented by the Government in accordance with our decision in United States v Brown, supra.