UNITED STATES, Appellee

v

RAYMOND B. PARISH, Private,
U. S. Army, Appellant

17 USCMA 411, 38 CMR 209

No. 20,491

March 1, 1968

*Captain Mark Kessel* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel T. Ghent* and *Major Jack G. McKay.*

*Captain Robert T. Mitchell, Jr.,* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel David Rarick* and *Major John F. Webb, Jr.*

## Opinion of the Court

KILDAY, Judge:

Appellant was arraigned before a general court-martial convened at Fort George G. Meade, Maryland, charged with attempted robbery and attempted murder while perpetrating a robbery, in violation of Article 80, Uniform Code of Military Justice, 10 USC § 880, and robbery, in violation of Article 122, Uniform Code of Military Justice, 10 USC § 922. He pleaded not guilty as charged but, with reference to the attempted robbery and robbery specifications, he pleaded guilty only to assault, in violation of Article 128 of the Uniform Code, supra, 10 USC § 928. He was found not guilty of attempted murder but guilty of the remaining specifications *as charged* and sentenced to a bad-conduct discharge, total forfeitures, and confinement at hard labor for three years. Intermediate appellate authorities affirmed the findings and sentence.

We granted review to determine whether the appellant was denied military due process and his right to a speedy trial by the undue delay between his initial confinement and his trial.

Once again we are faced with the vexatious problem of determining the impact on the trial of a case because of the failure by military authorities to comply with the provisions of Articles 10 and 33 of the Code, supra, 10 USC §§ 810, 833.[1] See United States

---

[1] "Art. 10. Restraint of persons charged with offenses.

"Any person subject to this chapter charged with an offense under this chapter shall be ordered into arrest or confinement, as circumstances may require; but when charged only with an offense normally tried by a summary court-martial, he shall not ordinarily be placed in confinement. When any

412

v Williams, 16 USCMA 589, 37 CMR 209; United States v Schalck, 14 USCMA 371, 34 CMR 151.

The basic procedural facts bearing on this issue are not in dispute for they were agreed to by both counsel in a stipulation (Prosecution Exhibit 1) utilized by them in arguing before the law officer when trial defense counsel moved for dismissal of all charges and specifications on the ground that Parish had been denied a speedy trial, in violation of the Sixth Amendment to the Constitution and of Articles 10 and 33 of the Code, supra. The basis for counsel's motion stems from the following facts.

The alleged offenses were committed on August 23, 1966, and Parish was ordered into confinement by his commanding officer, Lieutenant D, on the same day. He was interviewed by a military investigator on August 25th, at which time he gave a statement which was admitted into evidence at his trial. Therein, the appellant recounted his activities of the evening in question. He stated he was quite drunk when he returned to the barracks. There he obtained a .22 caliber revolver from his locker, went outside and pointed it at Specialist Four D, who was guarding the mess hall. He ordered the former over to his car and on arrival asked for money. Specialist Four D showed him an empty wallet. He then demanded the car keys, whereupon the soldier refused and started to run. As he did so, he tripped and fell and Parish ran away. Later, while still on base, Parish encountered a person in civilian clothes (later identified as Private E-2 H). He drew the revolver again and ordered this person to drive him off base, which he did. After leaving Fort George G. Meade, Parish ordered the man out of the car and drove away. He wrecked the car and did not remember anything until he was in a police station. In answer to questions propounded by the investigator, the appellant denied that the pistol was loaded or that he had ammunition for it. He also denied that he took any money from the man in civilian clothes or that he attempted to run over this man with his car.

On September 21, 1966, Lieutenant J took over as company commander and two days later the military investigators completed their interviews of witnesses. Their final report, dated October 3, 1966, was received by Lieutenant J on October 5, 1966. Included therein were statements of the victims of the alleged offenses, both dated August 23, 1966, and one (undated) from the Maryland State Trooper who initially apprehended Parish on August 23d. An interim progress report was furnished to the appellant's commanding officer on August 24, 1966.

On October 12, 1966, charges (attempted robbery and robbery) were read to the appellant. Subsequently, on October 23d, an attempted murder charge was added and Parish so informed on October 25th. The Article 32 officer, appointed October 28th, completed his investigation on November 2d. The charges were redrawn on November 8th, read to the appellant on the same day, and a new Article 32 report submitted on the 18th. On December 8th, the charges were referred to the officer exercising general court-martial authority, appellant was served on the 12th, and trial was held on January 4, 1967.

Essentially, the stipulated chronology of events reflects that there was a lapse of some fifty days between the date of

person subject to this chapter is placed in arrest or confinement prior to trial, immediate steps shall be taken to inform him of the specific wrong of which he is accused and to try him or to dismiss the charges and release him."

"Art. 33. **Forwarding of charges.**

"When a person is held for trial by general court-martial the commanding officer shall, within eight days after the accused is ordered into arrest or confinement, if practicable, forward the charges, together with the investigation and allied papers, to the officer exercising general court-martial jurisdiction. If that is not practicable, he shall report in writing to that officer the reasons for delay."

confinement (August 23d) and the date the original charges were read to the accused (October 12th); thirteen days later (October 25th) he was informed of an additional charge; nine days thereafter (November 3d) the charges were forwarded to the convening authority; and trial was held sixty-two days after referral (January 4, 1967). The total elapsed time between confinement and trial was 134 days. We are primarily concerned with ██ ■ the period of time between the confinement and the original reading of the charges—fifty days. The Code specifically requires (Article 10, supra) that *immediate* steps be taken to inform a confined accused of the charges and to try him or to dismiss the charges and release him. If not released, charges are to be forwarded to the officer exercising general court-martial authority (convening authority) *within eight days*, if practicable; if not practicable, a written report explaining the delay should also be submitted (Article 33, supra). In each instance, the burden of compliance with these codal provisions is on the accused's commanding officer.

Before the law officer, the Government, in answer to defense counsel's motion to dismiss, presented a stipulation from Lieutenant D and the testimony of Lieutenant J, the aforementioned unit commanders. The gist of their testimony was that they were both inexperienced and not aware of the specific provisions of the Code now under scrutiny. Lieutenant D, just out of Officer Candidate School, was an interim commander (eight weeks) and in his stipulation he asserted that he was waiting for the completed report of the Criminal Investigations Detachment, as directed by someone (unknown) from the staff judge advocate's office; that when Lieutenant J took over the unit prior to its receipt,[2] he briefed him on the case. The latter acknowledged having been informed that Parish was in custody, suspected of robbery and attempted robbery. He also waited for the Criminal Investiga-

tions Detachment report since his predecessor had indicated he should. He had served a tour in Vietnam but had never before handled a court-martial. Both admitted to having received instructions in military justice, Lieutenant D while in Officer Candidate School and Lieutenant J while participating in the Reserve Officers' Training Course and again while taking the Signal Corps Officers' Basic Course at Fort Gordon. Lieutenant D visited Parish in the stockade on two occasions, once to pay him and again for an unrecalled reason, but on neither occasion did he speak with him about his reason for being confined. The first time Lieutenant J saw the appellant was on the occasion on which he read to him the original charges.

Trial counsel admitted that the initial delay was substantial but contended it was not unreasonable in view of the inexperience of the officers involved. He argued that "the Government is not made up of perfect people, I think the test is whether the Government acted reasonably and in good faith as opposed to acting maliciously or with gross negligence and apathy under all the facts and circumstances."

In United States v Hounshell, 7 USCMA 3, 21 CMR 129, we had before us a case where that accused was in confinement some sixty-nine days before he was informed of the charges against him. There the issue was thoroughly discussed but we held that the right was waived by failure of individually retained civilian counsel to raise the issue at trial. While doing so, however, we quoted extensively from the Hearings before the House Armed Services Committee, 81st Congress, 1st Session, on HR 2498, pages 906–908, which clearly indicated that Congress did not intend the military practice to be different from the regular Federal criminal court procedure. As noted therein, when Article 10 was before the Committee, questions were raised as to the meaning of the word "immediate," and a suggestion was made that perhaps a specific time

---

[2] Lieutenant J assumed command on September 21st. However, he was briefed on the operation of the company by Lieutenant D from September 16th to the 21st.

should be inserted. The drafters of the Code, who were then testifying, informed the Committee that Article 10 was designed to assure an accused of a speedy trial but not one which is so speedy that he is unable to prepare his defense. In addition, the Committee was assured that a serviceman would not languish in confinement in view of a combination of Articles 33 and 98[3]— the latter, a new provision, which made it an offense to engage in any unnecessary delay. As expressed by Mr. Larkin, General Counsel, Department of Defense:

> "So in addition to providing that there be an immediate processing of the charges, if anybody unnecessarily delays doing it, he himself becomes liable to an offense, you see." [Hearings, supra, at page 907.][4]

See, also, United States v Wilson, 10 USCMA 337, 27 CMR 411. In United States v Brown, 10 USCMA 498, 28 CMR 64, we held that the law officer erred in requiring the defense to show that it was materially prejudiced by the delay. We there stated that by his action the law officer shifted the burden to the defense, when it is properly a function of the prosecution to affirmatively justify the delay, and prevented a determination of whether or not the lapse of time was due to purposeful or oppressive design on the part of the prosecution or to a lack of reasonable diligence. Cf. United States v Schalck, supra, on this latter point.

The case at bar is more in point with that which pertained in United States v Williams, supra, although in that case the delay was longer and the accused was only in restriction (arrest). As we noted in *Williams*, that accused's battalion adjutant, in explaining the passage of time, stated that he " 'was unfamiliar with the regulation that states you must give your full attention to these things.' " (16 USCMA, at page 593.) So, too, here, the company commanders involved were *unfamiliar* with the pertinent codal safeguards. In addition, the prosecution in this case called as a witness the post judge advocate. The latter testified that he first saw the charges on October 17th. He "was concerned about the case because it seemed there was an unreasonable delay between the time the man was placed in confinement and the time charges were actually prepared the first time." He called Lieutenant J and learned that the preparation of the charges had been delayed until the CID investigation was completed. "This is clearly an improper procedure and as a result of this case and another case which was going on at the same time a meeting was called by the Post Commander in his office at which representatives from the various parts of the command involved in this discussed this problem as well as the problem in another case." The witness testified that he is available to commanders for advice and replied to counsel's inquiry on cross-examination that this was not such a case as would cause him to advise delay in preferring charges pending receipt of a CID report. Of his knowledge, he was not aware that anyone in his office had advised Lieutenant D to delay the charges. Had such been given, he testified, "I think it would be highly improper advice."

The military investigator testified that he is, by internal regulation, required to submit a first progress report in two days. This he did and a copy was forwarded to Parish's unit. A completed or second progress report is required in thirty days. Commanding officers can and most often do prefer charges based on the first report, according to the witness. There was, in

---

[3] "Art. 98. **Noncompliance with procedural rules.**

"Any person subject to this chapter who—

"(1) is responsible for unnecessary delay in the disposition of any case of a person accused of an offense under this chapter; or

"(2) knowingly and intentionally fails to enforce or comply with any provision of this chapter regulating the proceedings before, during, or after trial of an accused;

shall be punished as a court-martial may direct."

[4] We have not found nor has any case been called to our attention where prosecution has been instituted under Article 98.

his opinion, sufficient data in the first report to institute charges of robbery, attempted robbery, and aggravated assault. On many occasions, commanders involved ask to see any available statements of an accused or the witnesses. Had either of these lieutenants made such a request it would have been honored.

In asserting substantial prejudice by reason of the delay, defense counsel alleged that he had lost the services of two witnesses: one, a go-go girl, who had danced extensively with the appellant on the night in question and the other, a bartender in the place where the accused drank. Counsel believed that both could testify as to the accused's drunkenness. It was asserted at trial that he was too drunk to form the specific intent to rob or to murder. This was the basis for his plea of guilty to the lesser included offense of assault. Since counsel was not appointed until November 1st, the day before the initial Article 32 was conducted, earlier effort to secure the witnesses could not be made. Later efforts were negative, the girl having disappeared and the bartender could not recall. Of interest is the fact that the State Trooper who arrested the accused noticed the odor of alcohol on his breath four hours after midnight, the latest hour at which he could have purchased a drink. Not having these witnesses, the defense was limited to the unsubstantiated testimony of the accused on the merits as to the amount he drank that evening (Scotch with a beer chaser—total cost about $13.00), and the testimony of an Army physician that a hypothetical person of accused's size, general condition, and his recent consumption of food, who drank that much would normally have an alcohol content in his blood of between .25 and .35 percent—"a state of moderate to marked intoxication. It [.25 percent] is .1 of 1% while the legal accepted level for intoxication in this State is .15%. . . . .35% is getting into the range of complete unconsciousness."

The right to a speedy trial is relative, and whether or not an accused has been denied the right to a speedy trial depends upon the facts and circumstances of each case. United States v Brown, 13 USCMA 11, 32 CMR 11, and cases cited therein. In determining whether there has been a denial of such a fundamental right, we will examine into whether there has been a purposeful or oppressive design on the part of the Government to delay the trial and whether the Government has proceeded with reasonable diligence in bringing the charges to trial. United States v Brown, supra. As we noted in United States v Smith, 17 USCMA 55, 58, 37 CMR 319:

". . . An apparently satisfactory explanation for a particular delay might be revealed as unreasonable in the light of specific harm to the accused occasioned by the delay. United States v Broy, 14 USCMA 419, 421–422, 34 CMR 199; Woody v United States, 370 F2d 214 (CA DC Cir) (1966); cf. United States v Hammond, 360 F2d 688 (CA2d Cir) (1966), certiorari denied, 385 US 918, 17 L ed 2d 142, 87 S Ct 227 (1966)."

Under the circumstances of this case, we are constrained to hold that the appellant was prejudiced by the delay between his confinement and the imposition of charges. See Code, supra, Article 33. The Government contends that the delay was reasonable because the accused was informed by the investigator within two days of the offenses of which he was suspected (cf. United States v Tibbs, 15 USCMA 350, 35 CMR 322, and the delay thereafter in filing charges was due to the inexperience of the officers involved. We do not agree. In United States v Tibbs, supra, we were concerned with an accused who was caught in the post exchange, which he had forcibly entered, and was apprehended with stolen merchandise in his pockets. He was confined on July 2d, charges were filed July 17th, and he was so informed on July 25th. As we there observed, he was at once aware of the precise wrongs with which he was charged

and could little benefit from specific notice immediately after arrest or confinement. In this case, the suspected aggravated assault, of which he was informed by the investigator, was much later (October 25th) charged as attempted murder, an offense of which he had *no* foreknowledge, a vast difference from the situation found in *Tibbs*.

As to the inexperience of the officers involved, we do not believe this is a legally or factually sufficient explanation. Whether they thought they were doing their job is irrelevant. The plain fact of the matter is that the delay occurred. Whether there are in existence any controls to prevent such occurrences has not been specifically drawn to our attention. It would seem there should be. The conference by the post commander is in keeping with the act of locking the barn door after the horse is stolen. We are not here passing judgment on Lieutenants D and J or on anyone else who might have been responsible. That is not within our province.

In view of the action we take in this case, we need not consider whether the subsequent passage of time before trial adversely affected the appellant. Suffice it to note that the "corrected" charges on which he was tried (January 4, 1967) were not read to him until November 8th. Formal service, with notice of referral to a general court-martial, was made on December 12th.

Inasmuch as we find prejudicial error in this case, the appellant's conviction for robbery and attempted robbery must be set aside. In addition, since a plea of guilty does not deprive an accused of the protection afforded him by Articles 10 and 33 of the Code, supra (United States v Tibbs, supra), his plea of guilty to the lesser included offense of assault is similarly infected and cannot be affirmed.

Accordingly, the decision of the board of review is reversed. The record of trial is returned to the Judge Advocate General of the Army. The charges are ordered dismissed.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

Military commanders and military policemen have no more hours in a day than anyone else; they, too, must apportion their time to do all they have to do. Certainly, pretrial confinement of an individual is a matter of grave concern, but officials processing accusations against accused cannot devote all their energies or all their time to a particular accused. In fact, the law demands no more than that they act reasonably in the circumstances. Pollard v United States, 352 US 354, 361, 1 L ed 2d 393, 77 S Ct 481 (1957); United States v Callahan, 10 USCMA 156, 27 CMR 230. Even brief periods of inactivity are not censurable. United States v Brown, 13 USCMA 11, 14, 32 CMR 11.

The chronology of events and undisputed facts, which is attached here as an appendix, convinces me, as it convinced the law officer, the convening authority, and the board of review, that the Government acted with reasonable dispatch, and without any purpose to oppress the accused. I am equally convinced the accused was not prejudiced in his defense by anything that transpired between his confinement and the trial. The chronology speaks for itself; the alleged loss of defense witnesses needs discussion.

Two potential witnesses are involved. One was the bartender at the Americana Lounge. He was not interviewed by defense counsel until December 20, 1966. At that time, he indicated he could not "positively identify" the accused as a patron of the bar on the night of the offenses. The other witness was Kathy, a go-go dancer. She left the Lounge "sometime in October," and her whereabouts was not "exactly" known. The most these witnesses could testify to was the extent of the accused's drinking and the state of his sobriety. The accused contended that between 6:00 p.m., and 12:30 a.m., he drank eighteen shots of scotch and six beers Corroboration of this contention could not help the accused in the slightest degree in establishing a defense.

The offenses were committed in places other than the Lounge. In his

**417**

sworn testimony at the out-of-court hearing on the motion to dismiss and in his pretrial statement of August 25, the accused demonstrated that he possessed full recall of his conduct, both at the Lounge and at the time of the offenses. Thus, in the former, he testified about the exact amount of money he spent for drinks, the persons that he talked to at the Americana Lounge, the "free" drink the bartender gave him, his dancing with the go-go girl, Kathy, and his apprehension and confinement "[r]ight after . . . [he] wrecked the Buick"; in the latter, he related when, where, why, and how he "pointed" his gun at Deamer, and he denied that he took any money from Haak when he "pulled the revolver" on him. It is significant that Agent Johnson reported that Haak's representation that the accused had taken money from him was not substantiated by his investigation. It is manifest from the evidence, therefore, that the bartender's uncertainty and Kathy's departure could not possibly have impaired the accused's defense against the charges.

Turning to the alleged violation of the notice requirement of Article 10, Uniform Code of Military Justice, 10 USC § 810, I find no support for the contention in the evidence. In material part, Article 10 provides that, when an accused is in arrest or confinement prior to trial, "immediate steps shall be taken to inform him of the specific wrong of which he is accused." We considered this provision in United States v Tibbs, 15 USCMA 350, 354, 35 CMR 322, and pointed out that this Court "consistently looked to the time of confinement" as the appropriate time for notification. However, we have never delineated the classes of persons who may properly inform an accused of the charges. Since I am writing in dissent I need not elaborate on my reasons, but it seems to me that the confining officer, a confinement official, or a law enforcement officer, is a proper person to inform the accused of the charges. The accused was confined on August 23, 1966. He testified that before he talked to Agent Johnson on August 25, 1966, he knew why he was

**418**

in the stockade. His testimony is as follows:

"Q. [Law Officer] Before seeing Mr. Johnson did you have any idea of what charges you were being held under?

"A. I knew what I was put in the stockade for. That was robbery and assault."

In my opinion, it is reasonably inferable from the accused's testimony that when he was confined he was informed by a confinement official of the specific wrongs of which he was suspected. Assuming, however, that I read too much into the accused's testimony, there is still no reason to conclude, as the majority do, that he was prejudiced by the delay in apprising him of the charges. In Tibbs, we considered the effect of actual knowledge on the part of the accused as to the reasons for confinement. What we said there is completely opposed to the majority's present ruling:

"In Burns v Harris, 340 F2d 383, 386 (CA8th Cir) (1965), the accused was confined by sentence of a court-martial. He sought a writ of habeas corpus, partly on the ground that, while in pretrial confinement, he was not, in violation of Article 10, notified of the accusation against him. The Court of Appeals rejected his contention. It said: 'his knowledge is conclusively demonstrated by his oral confession to the assault on the very day he was apprehended and by his being placed in pretrial confinement only after that confession.' Here, the accused was caught in the Exchange building, which he had forcibly entered, and was apprehended with stolen merchandise in his pockets. Under these circumstances, he could not, as the law officer observed, have 'any question in his mind' as to the reason for his confinement.

"If the accused knows immediately before his arrest or confinement the precise offense which led to the restraint on his freedom, what benefit can he possibly derive from notice immediately after his arrest or confinement that he is being held for

that wrong? The purpose of the notification requirement of the Article is to provide the accused with knowledge of the offenses charged so that he might at once consider his defense and apprise his family, friends, or counsel of his predicament to enable them to assist him by whatever means available. That purpose is satisfied whether the accused's knowledge of the specific offense comes immediately before or immediately after arrest or incarceration. When it is certain that the basic purpose of a prescribed procedure has been achieved, a departure from the strict letter of the law defining the procedure is not a denial of due process. See United States v Cruz, 10 USCMA 458, 28 CMR 24. It may be that, while caught in the commission of a crime, the accused might not know his conduct subjects him to a serious charge. For example, the accused might, in the course of an argument, strike at another with a chain. Depending upon its construction, size, and other characteristics, the chain could be a dangerous weapon; if it is, the accused could be confined on a charge of assault with a dangerous weapon, yet he could reasonably believe he was held merely for simple assault. See United States v Cook, 12 USCMA 518, 31 CMR 104. In such a situation, the accused's antecedent knowledge might not satisfy the mandate of Article 10. The stipulation of facts in this case leaves no doubt of the accused's knowledge of the nature of the offenses for which he was confined. Consequently, whatever the basis of the law officer's ruling, the facts exclude the conclusion that the accused did not comprehend the specific wrongs for which he was confined." [United States v Tibbs, supra, at pages 354–355.]

So far as the time requirement, under Article 33, Code, supra, 10 USC § 833, for forwarding the charges for trial is concerned, I am not at all sure the proceedings were improper, or, if improper, that dismissal of the charges is the necessary consequence. Thus, in United States v Callahan, supra, we pointed out that, unlike Article 10, Article 33 does not provide for dismissal of the charges for noncompliance with its provisions. I pass that point, however, because, in my opinion, our decision in Tibbs is not inapposite, as the majority say, but directly relevant to this case. In Tibbs, we said:

". . . The problem presented by the Article is determination of the time the accused is 'held for trial by general court-martial.' Is this the moment of confinement? Is it the moment the officer exercising Article 15 jurisdiction over the accused recommends the accused be held for trial by general court-martial? See Manual for Courts-Martial, supra, paragraph 32. As this case shows, these times may be materially different; and the latter may occur more than eight days after the accused is ordered into confinement. Assuming for the purpose of this appeal that the eight-day period starts to run from the moment of confinement, the failure to report to the general court-martial authority on the impracticality of forwarding the charges is not ground for reversing an otherwise valid conviction, if satisfactory reasons actually appear in the record of trial. In that situation, the record itself demonstrates that 'neither a denial of due process nor prejudice to the substantial rights of the accused' is present. United States v McKenzie, supra, at page 364.

"As we indicated earlier, the accused was confined on July 2; the file on the case was received by the general court-martial authority on August 4. The steps taken in the intervening period show clearly the impracticability of forwarding the charges and allied papers to the general court-martial authority within eight days of the accused's confinement. There is, therefore, no indication of a violation of the requirements of Article 33 of the Uniform Code, supra." [United States v Tibbs, supra, at pages 356–357.]

I previously indicated that the chronology of events demonstrates it

**419**

was impracticable to transmit the charges to the general court-martial authority within eight days of the accused's confinement. In my opinion, *Tibbs* also is dispositive of this aspect of the case.

I would affirm the decision of the board of review.

## APPENDIX

### Chronology of Events and Undisputed Facts

August 23, 1966 (Tuesday)

Offenses committed about 2:15 a.m.

Accused apprehended by Maryland State Police about 4:00 a.m.

Sometime during the day the accused's commanding officer, Second Lieutenant Merril Davis, was notified that the accused was being held by the Military Police for taking money and a car at gunpoint. He ordered that the accused be placed in "pretrial confinement."

August 23–30, 1966

Lieutenant Davis "did not know what to charge . . . [the accused] with" without the "back up" of a police report. He waited "about a week" expecting to receive this report. He called the Criminal Investigations Detachment (the time is unspecified) and was "told that the report was not yet completed." He called the staff judge advocate's office for advice, and it was "suggested" that he wait for the CID report.

On August 23, Agent Allen R. Johnson was assigned to the case. On that day, he interviewed Private Herbert Haak, Jr., and Specialist Four Clifford B. Deamer, the victims, and a Maryland State Trooper.

On August 24, Agent Johnson made a progress report. The "preliminary investigation" indicated the accused had "pulled a gun" on two persons and had attempted to take a vehicle from one of them. On that same day, Johnson "sent . . . off" a request for a check of the criminal files at Fort Holabird. Apparently, about this time he also sent exposed film concerning the

case to the photo lab at Fort George G. Meade for processing.

On August 25, Agent Johnson interviewed the accused in the post stockade. He advised the accused he was suspected of "robbery and aggravated assault" and informed him of his rights under Article 31, and his right to counsel. The accused gave Johnson a statement, which was admitted into evidence, in which he said he "pointed" a revolver at Deamer and "asked" him if "he had any money"; Deamer showed him an empty wallet. The accused also admitted he "pulled the revolver" on another person and "asked" for a car with keys in it. He took a car and "drove for a ways and then wrecked" it.

September 3–5 (Labor Day weekend), 1966

Agent Johnson was assigned to investigate "a series of breakings and enterings on post." (These offenses continued to the end of the month; the total number was approximately twenty-two. In addition to these investigations, Johnson was assigned to five cases, besides the accused's.)

September 6–8, 1966

On September 6, Agent Johnson attempted to contact one of the victims to "reinterview him." The victim had said that the accused had taken money from him. Agent Johnson's later report indicates: "Investigation failed to substantiate this allegation."

In this period, Johnson received a report on his request for a check of the criminal files. He also "received back" the photos he had sent to the photo lab.

September 12–16, 1966

During this period, Johnson attempted to contact a witness named Matthews, but had no success.

September 23, 1966

Johnson succeeded in contacting Specialist Four John Richard Matthews and another witness, Sergeant Richard Monroe. He started work on his final report.

September 26 or 27, 1966

Johnson completed his report and

submitted it to "operations" for review and typing.

October 3, 1966 (Monday)

Typed report received by Johnson.

October 4, 1966 (Tuesday)

Report sent to Provost Marshal for distribution.

CID report was received in the accused's unit by First Lieutenant Daniel William Judge. He "went to work immediately" to prepare the Charge Sheet. It was the "first court-martial" in the unit and he had "to find out what had to be done." At the same time, the company was confronted with "an IG inspection and a CMMI inspection." In Lieutenant Judge's opinion, which was requested by defense counsel, he could not have prepared the Charge Sheet any sooner than he did, without "letting the other three hundred men in my company down." "[N]o matter" what he had done, it could not have made "more than a day or two difference" in the preparation of the Charge Sheet.

October 12, 1966 (Wednesday)

Original Charge Sheet prepared. Two charges were alleged, robbery and attempted robbery.

Lieutenant Judge went to the stockade and read the charges to the accused.

The Charge Sheet and supporting papers were transmitted by Lieutenant Judge to the Commanding Officer, Special Troops Regiment.

October 12–15, 1966

The charges were reviewed by the Commanding Officer, Special Troops Regiment, and forwarded to Headquarters, Fort George G. Meade, with a recommendation for trial by general court-martial.

October 17, 1966 (Monday)

Charges were received at Headquarters, Fort George G. Meade. They were submitted to the Post Judge Advocate, Captain Joseph Smith Wager, for review.

October 17–25, 1966

Captain Wager reviewed the materials and conferred with Lieutenant Judge. He made "corrections," including a recommendation that a specification be added to allege an "attempt to intentionally kill or inflict great bodily harm" on Private Herbert Haak, Jr., by running into him with an automobile.

Captain Wager testified that it took the period from October 17 to October 25 to complete his review because this "was a very difficult case." He had to consult with another attorney, who "worked" with him on the case.

October 25, 1966 (Tuesday)

Redrafted Charge Sheet, embodying the attempt specification recommended by Captain Wager, was signed by Lieutenant Judge as accuser.

October 27, 1966 (Thursday)

Lieutenant Judge informed the accused of the redrafted charges.

Redrafted charges were received by Special Troops Regiment.

October 27–November 1 (Tuesday), 1966

Sometime during this period the Commanding Officer, Special Troops Regiment, reviewed the charges and directed an Article 32 investigation.

November 2, 1966 (Wednesday)

Article 32 investigation held. The accused was represented at the investigation by Captain Donald H. Partington, a member of the Judge Advocate General's Corps.

The Article 32 report was submitted to the Commanding Officer, Special Troops Regiment.

November 3, 1966 (Thursday)

Special Troops Regiment transmitted the Charge Sheet and the Article 32 investigation report to Headquarters, Fort George G. Meade, where it was directed to Captain Wager for legal review and recommendation.

November 3, or November 4 (Friday), 1966

Captain Wager discussed the case with the Post Commander. As a result of this discussion, Wager "carried" the record to "First Army."

**421**

November 5–7, 1966

Apparently, the case was considered in the office of the Staff Judge Advocate, First Army.

November 7, 1966 (Monday)

Late in the day, the Charge Sheet was returned to Headquarters, Fort George G. Meade, by First Army for correction. It was noted that the additional specification alleging the "attempt to intentionally kill" did not conform to the model form of specification set out in the Manual for Courts-Martial, United States, 1951.

November 8, 1966 (Tuesday)

Captain Wager discussed correction of the Charge Sheet with Lieutenant Judge. He "handcarried" the charges to the Lieutenant.

A new Charge Sheet was signed and sworn to by Lieutenant Judge.

The accused was informed of these charges.

These charges were transmitted to Headquarters, Special Troops Regiment.

November 9, 1966 (Wednesday)

Charges were received at 8:00 a.m., by Special Troops Regiment.

Article 32 investigation was ordered.

November 10 (Thursday), or November 11 (Friday), 1966

The Article 32 investigating officer called Captain Partington, defense counsel, and asked for "the earliest date he would be available for" the hearing. The date Captain Partington "gave" him was November 16, 1966.

November 17, 1966 (Thursday)

Article 32 investigation report submitted.

Report transmitted by Special Troops Regiment to Commanding Officer, Fort George G. Meade.

November 18 or 19, 1966

Case reviewed by Captain Wager, Post Judge Advocate.

Case reviewed by Post Commander and taken to First Army by Captain Wager.

November 22, 1966 (Tuesday)

Case received by Commanding General, First Army, the general court-martial authority, and routed to the staff judge advocate for pretrial advice, as required by Article 34, Uniform Code of Military Justice, 10 USC § 834.

December 6, 1966 (Tuesday)

Pretrial advice submitted by staff judge advocate to convening authority.

December 8, 1966 (Thursday)

Convening authority referred case to trial by general court-martial.

December 12, 1966 (Monday)

Charges served on accused by trial counsel.

January 4, 1967 (Wednesday)

Day of trial. The date had been agreed upon by defense counsel and trial counsel. It was originally set for January 17, but was advanced to January 4, 1967.