**UNITED STATES**

v.

**Bennie TARVER, Jr., 268 56 6150 Private First Class (E–2) U. S. Marine Corps.**

**NCM 75 2101.**

U. S. Navy Court of Military Review.

17 Dec. 1975.

DECISION

CEDARBURG, Chief Judge:

This appellant was tried and convicted of one specification of robbery in violation of Article 122, 10 U.S.C. § 922, of the Uniform Code of Military Justice.[1] He was sentenced to confinement at hard labor for four years, total forfeitures, reduction to pay grade E–1 and a dishonorable discharge. The convening authority reduced the term of confinement to two years and otherwise approved the sentence.

Appellant predicates his demand that his conviction be set aside and the charges dis-

---

1. This is a companion case to *United States v. Warrington*, 2 M.J. 1173, decided this date.

missed upon alleged violations of his rights under Articles 10 and 33 of the Uniform Code. We will grant relief.

A stipulated chronology shows that appellant's term of pretrial confinement spanned 89 days. By releasing him on the 89th day, the government narrowly avoided the strictures of the 90-day *Burton* presumption, 21 U.S.C.M.A. 112, 44 C.M.R. 166 (1971). Appellant's submission of a demand for speedy trial, however, brought into play the second prong of the *Burton* rule, which subjects any delay in the proceedings thereafter to close scrutiny. *See United States v. Johnson*, 23 U.S.C.M.A. 397, 50 C.M.R. 279, 1 M.J. 101 (1975). We must therefore closely examine the government's diligence in bringing this case to trial, recognizing that "a failure to respond to a request for a prompt trial or to order such a trial may justify extraordinary relief." 21 U.S.C.M.A. at 118, 44 C.M.R. at 192.

The offense of which appellant was convicted occurred on 30 December 1974. Milestones in the government's progress toward trial which are relevant to our decision are:

| | |
|---|---|
| 30 Dec 74 | NIS Agent S_____ interviews allegations against appellant, interviews witnesses and victim. Appellant is placed in pretrial confinement. |
| 8 Jan 75 | Appellant addresses demand for speedy trial to Commanding Officer 2d Engineer Battalion. |
| 23 Jan 75 | Battalion Office Hours held. |
| 25 Jan 75 | Chief trial counsel forwards appellant's speedy trial demand of 8 Jan to Commanding Officer 2d Engineer Battalion. |
| 30 Jan 75 | Trial counsel appointed. |
| 5 Feb 75 | Commanding Officer 2d Engineer Battalion replies to speedy trial demand. |
| 11 Feb 75 | Charges are preferred. Investigating Officer receives charge sheet and appointing order. |
| 28 Feb 75 | Article 32 hearing conducted. |

The government's diligence in this case must be measured in light of these facts and circumstances:

(a) Appellant's early demand for speedy trial, lodged at the outset of his pretrial confinement, remained unanswered for 29 days.

(b) The first evidence of motion by the government, battalion office hours, did not take place until 25 days after the beginning of pretrial confinement, although office hours were ordinarily held within 24 hours of the commencement of confinement. The failure to comply with Article 33 is highly relevant to this period, for Article 33 allows a maximum of eight days after the commencement of confinement for the commanding officer to decide if the case is sufficiently serious to warrant general court-martial and prescribes certain steps that he must take if the case is to be tried in this forum.

(c) One month passed between the alleged offense and the appointment of a trial counsel to familiarize himself with the case and monitor its progress to trial.

(d) The first meaningful movement by the government, preferral of charges and receipt of his appointing order by the Article 32 Investigating Officer, took place 42 days after appellant entered into pretrial confinement and 35 days after his demand for a speedy trial.

(e) Fifty-nine days passed between the start of pretrial confinement and the Article 32 hearing. The existence of the speedy trial demand was never conveyed to the Investigating Officer.

Lieutenant M_____, legal officer of the 2d Engineer Battalion, testified that he had not received formal schooling for his assignment. His unawareness of the very existence of Article 33 of the Uniform Code of Military Justice led to noncompliance with that Article, although he asserted that compliance could have been effected had he known of its requirements. He stated that "as a general rule, if an offense is committed during working hours, we usually will

hold office hours on the young man before we confine him in any way," while office hours were conducted the next day if the offense occurred at night. In this case office hours were held in abeyance pending receipt of the investigative report of the Naval Investigative Service. When the anticipated report had not materialized by the latter part of January in spite of Lieutenant M_____'s efforts to expedite its preparation, office hours were finally held on 23 January, at which time the commanding officer of the battalion was in possession of the statement of the victim of the alleged offense. Lieutenant M_____ admitted that he had not asked NIS to supply him with the names of any witnesses to the incident in lieu of the formal report. He said:

> Normally, sir, the Colonel would not confine a man just on the testimony of a witness. He would have to either have an official document in front of him, or someone like an NIS Agent saying, "Well, this took place and I'm pretty sure that this happened . . ."

The Article 32 Investigating Officer, Lieutenant S_____, testified that he received the charge sheet and appointing order on 11 February. A phone call to NIS revealed that their report had not yet been completed. Because Lieutenant S_____ "did not, under the circumstances, know the charges, witnesses, or anything," he "did not feel that I could continue the investigation until I received a report from NIS." One week later, on 18 February, he again contacted NIS who told him that the report had been forwarded to him via the chain of command. This report reached him some time before 21 February, a Friday. During the next week, Lieutenant S_____ called in witnesses for interviews and attempted to schedule the Article 32 hearing:

> We were extremely busy during that week; I was working with three lawyers, and I had to work my hearings around their schedules. I attempted several times during the week to hold an Article 32 hearing and I finally, because of the schedules of the lawyers and lack of courtroom space, I finally held a hearing

over at the base facilities on Friday afternoon.

This Friday was 28 February, two months after the date of the alleged offense. Lieutenant S_____ had not received notice of appellant's speedy trial demand.

Special Agent S_____, the Naval Investigative Service Agent responsible for the case, investigated the allegations against appellant and interviewed the witnesses on the date of the incident. He prepared the NIS report in the case. He testified that official business had taken him away from Camp Lejeune from 6 January to 9 January but that by 15 January he had dictated a report of his investigation and left it with his office to be typed and given to the Senior Resident Agent for review and dissemination. Special Agent S_____ departed Camp Lejeune on 17 January for active duty training with the Marine Corps in California and returned on 2 February. He then found that his report had been typed in rough draft form and placed in his file. On this day he also found a report from the fingerprint laboratory at Fort Gordon, where he had sent some currency seized from appellant's alleged coactor for analysis. He decided to append a paragraph to his report discussing the laboratory's findings and returned the draft to his secretary for final preparation. Severe personnel and administrative difficulties in his office contributed to the slowness of the report's finalization:

> At that time we were only employing two secretaries in our office and we had a tremendous administrative backlog which was taking weeks to get cases typed, so we were forwarding some of our work to other offices like Jacksonville, Florida or Charlestown, South Carolina.

Although Special Agent S_____'s typed report was not completed and disseminated until 18 February, the information upon which it was based had been obtained in interviews with the victim and witnesses conducted on the day of the alleged offense. The formal statement of the victim had not been taken at his first interview with Special Agent S_____ because of the lateness

of the hour, but was transcribed very shortly thereafter. Special Agent S_____ had been prepared from this time to furnish the substance of his information to Lieutenant M_____, and presumably to the investigating officer, although he would not turn over the actual notes that he had taken during his interviews:

> Q. [D.C.] In fact, any information you had would have been available to Lieutenant M[_____]?
>
> A. Anything I've got, sir, would have been available right after the robbery.
>
> Q. Or virtually right after the robbery.
>
> A. Yes, sir.

Despite appellant's prompt demand for speedy trial, two vital stages of the government's progress to trial, the initial screening of his case by his commanding officer preceding his determination of the appropriate trial forum, and the actual Article 32 hearing, were delayed by agents of the government who were waiting for the report of the Naval Investigative Service. According to the testimony of Lieutenant M_____, battalion office hours, normally held within twenty-four hours of the outset of confinement, were repeatedly deferred until the 25th day of confinement. Because of this delay and the passage of time in effectuating the Commanding Officer, 2d Engineer Battalion's subsequent decision that the case merited trial by general court-martial, the investigating officer did not receive notice of his appointment until 42 days of confinement had elapsed. Because the NIS report was not available, Lieutenant S_____ waited almost two additional weeks before beginning to prepare to hold his Article 32 hearing by interviewing witnesses and scheduling a date convenient to all attorney participants.

In *United States v. Reitz*, 22 U.S.C.M.A. 584, 48 C.M.R. 178 (1974), delay from 24 April, the date of confinement, until 24 May, a period of one month, was "occasioned by failure to convene the pretrial investigation until the CID has submitted its report." Citing a pre-*Burton* decision, the Court of Military Appeals said, "We have rejected the need to complete a criminal investigation report as an excuse for pretrial delay. *United States v. Williams*, 16 U.S.C.M.A. 589, 37 C.M.R. 209 (1967)." 22 U.S.C.M.A. at 585, 48 C.M.R. at 179. In this case statements of the victim and witnesses were taken "virtually right after" the incident. Their names were available to Lieutenant M_____ and Lieutenant S_____. Had Lieutenant M_____ wished, he could have conducted personal interviews with these individuals and arranged for their attendance at timely office hours. Although Lieutenant M_____ testified that his commanding officer waited for the NIS report because he desired the Naval Investigative Service's analysis and evaluation of the evidence, this view of his role implies an abdication of his personal responsibility under Article 33. There were sufficient facts available to him through the medium of personal, live testimony at office hours to enable him to exercise his judgment as to whether a trial by general court-martial was appropriate. He was not required to base his decision upon a quantum of evidence capable of perfecting the government's case. *See United States v. Mason*, 21 U.S.C.M.A. 389, 393, 45 C.M.R. 163, 167 (1972) ("This requirement [Article 33] in no fashion prohibits further investigation for matters material to the justifiable solution of the case."). The two-week hiatus between Lieutenant S_____'s receipt of his appointing order and the time at which he began to interview witnesses and schedule his hearing after he came into possession of the NIS report is a further indication of a lack of diligence by the government. Lieutenant S_____ had access to the witnesses themselves and indeed chose to interview them personally after he read the NIS report. The written statement of the victim, utilized at battalion office hours, was also within his reach. His delay cannot be explained by a necessity to await the report. *United States v. Reitz, supra; United States v. Pyburn*, 23 U.S.C.M.A. 179, 48 C.M.R. 795 (1974).

The government's lack of diligence is underscored by its failure to comply with Article 33 of the Code. Compliance with this

Article would have dramatically hastened the processing of appellant's case to fruition. Lieutenant M_____'s inexplicable ignorance of the very existence of this Codal provision and the consequent failure of his commanding officer to adhere to its requirements must be charged to the government. *United States v. Erwin*, 20 U.S.C.M.A. 94, 42 C.M.R. 289 (1970); *United States v. Parish*, 17 U.S.C.M.A. 411, 38 C.M.R. 209 (1968). Although we have declined to reverse solely because of an Article 33 violation in the absence of prejudice "where the record of trial and allied papers clearly show satisfactory reasons and the impracticability of so forwarding the charges," *United States v. Gatson*, 48 C.M.R. 440 (N.C.M.R.1974), Lieutenant M_____ testified that compliance had been entirely possible but for his personal unacquaintance with the Article. We must thus consider this governmental delict as we reach our decision. *United States v. Mason, supra; United States v. Weisenmuller*, 17 U.S.C.M.A. 636, 38 C.M.R. 434 (1968).

Applying to the foregoing facts and circumstances the "functional analysis" endorsed by the Court of Military Appeals in *United States v. Amundson*, 23 U.S.C.M.A. 308, 49 C.M.R. 598 (1975); *cf. Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), we find that appellant made a prompt, early demand for speedy disposition of his case, which demand went unanswered for almost one month; that unacceptable delay suffused the progress of the case through the first stage of significant movement, the Article 32 hearing; that the government has not advanced legally acceptable reasons to explain this delay and that appellant suffered a serious form of prejudice during the period of delay by remaining in continuous pretrial confinement for the majority of the period of delay. We conclude that the government has not shown that it proceeded with the reasonable diligence required under the current state of the law and therefore reverse. *United States v. Burton, supra; United States v. Johnson, supra.*

Our decision conforms to what I consider to be the ruling case law in the military justice system. The maintenance of the integrity of that system demands that we do so. *See United States v. Heflin*, footnote 6, 23 U.S.C.M.A. 505, 50 C.M.R. 645, 1 M.J. 132 (1975). The speedy trial standard in the military justice system is far more rigorous by comparison to constitutional requirements or standards of expedition in most civilian jurisdictions. *See United States v. Burton*, 21 U.S.C.M.A. 112, 117, 44 C.M.R. 166, 171 (1971). Recognizing the codal basis for greater expedition, I feel obligated, however, to record my disagreement with the result of dismissal we reach by applying, as we must, the ruling case law interpreting a serviceman's constitutional and codal rights to speedy trial.

I fully support the desirability of orderly, rapid progress to trial. It serves the government and society in most instances more than it does an accused. However, the ends of justice, the right of an individual member of society to be secure in his person and property, and the constitutionally recognized right of society to domestic tranquility are not served by dismissing egregious charges for delay attributed to the government which is neither deliberate, vexatious or oppressive within the context of a particular case, but not completed with what has been interpreted to be "reasonable" diligence. In the present case, none of these former factors were present. Rather, the delay was the product of inexperience and overburdened professional, administrative and clerical staff and, inferentially, the confusion and inefficiency accentuated by such a situation. The military community, reflecting the national phenomenon, has seen a rise in the number of violent criminal cases corresponding with the reduced deterrence of those crimes. As the caseload increases, so too does the probability—no, rather, the certainty—that unintended and unwanted delay will occur.

We should, more than rhetorically, question ourselves whether dismissal, which is extreme and final, is the appropriate remedy for that variety of government failing. Penalizing the members of a community for the good faith, but perhaps inept or overworked efforts of its agents, does not serve

society. Conscious and deliberate improprieties may be subject to correction in this fashion but Draconian measures are unlikely to eliminate errors in future cases which have their genesis in inexperience, overwork or lack of competence. Neither are the victims of these crimes vindicated by harsh measures exacted not against criminals but against society.

In the present case, the victim was attacked from behind while crossing the ceremonial field in front of the Headquarters, Marine Corps Base, Camp Lejeune. He had just completed his duties as a messman and was headed across the darkened field toward the bowling alley. It was payday and he had most of his pay, $153.00, in his wallet. One of his assailants grabbed him from behind and choked him while the other one was hitting him in the face. The victim, surmising the object of the assault, grabbed his wallet and held on to it until he could no longer breathe. He then released it. His assailants fled in two directions. The victim suffered a broken nose, lacerations of the face, a contused eye and a bite on an ear. In addition, by his own description at the time of the robbery and cowardly assault incident thereto, he "was going hysterical." The evidence of guilt of the accused adduced in a well prosecuted case was overwhelming. We entertain no doubt of his guilt or of the serious physical and psychic injury to the victim which will never be compensated even though his money was returned to him.

Dismissal in this case is a patently unfair result when the totality of the circumstances attending the 95-day total delay is balanced against the proven guilt of appellant of brutal, intentional criminal conduct flagrantly violating the rights of the victimized Marine and the military community. Justice imports more and should have to accept no less. The result in this case earns no respect or confidence from the victim or society. Likewise, it engenders no deterrence to a similar venture in the future by either this miscreant or others so inclined. It encourages disrespect for the law for its failure to achieve even a modicum of fairness. My reluctance in reaching the result

we decide is obvious. It is, however, dictated by existing case law interpreting the codal and constitutional rights to speedy trial.

The findings and sentence are set aside and the Charge and specification dismissed.

MURRAY, Judge (concurring):

I concur. It is regrettable that a case as well tried as this one, and as well reviewed in a lengthy, thorough staff judge advocate review, in which the evidence was given detailed examination and excellent critical appraisal, must fall on the basis of a denial of speedy trial. But such is the case! Positive action must be taken by the appellate courts to correct any inexcusable denial of fundamental military due process irrespective of the remaining merits of the case, *sub judice*. The exhortations and warnings of the appellate courts can no longer be ignored by simply releasing an accused from pretrial restraint on the 89th day in order to avoid the presumptive effect of the *Burton* rule. The responsible administrators of the law on the trial and intermediate levels are charged with great responsibility to protect our system of justice and to jealously safeguard all our fundamental due process rights during the pretrial, trial, and post-trial stages of each and every case. The consequences of the derelictions in the pretrial phases in the case, *sub judice*, must be borne by the government and notwithstanding what may well have been a sound case on its merits, the findings in this instance cannot be sustained in the face of a fundamental denial of pretrial due process. In the interest of preserving the integrity of the military justice system, I must concur in the Chief Judge's determination that the findings be set aside and the Charge dismissed.

GLASGOW, Judge (dissenting):

Inasmuch as the appellant was released from pretrial confinement on the 89th day, the 90-day rule announced in *United States v. Burton*, 21 U.S.C.M.A. 112, 44 C.M.R. 166 (1972), in the opinion of this author, does

not apply. I see no sinister motive in releasing the appellant from confinement "to avoid the *Burton* rule." A fact is a fact!

It appears that the only substantial difference in the chronology of events, prior to trial, in this case and its companion case, *United States v. Warrington*, No. 75 1928, 2 M.J. 1173, decided this date, is here the demand for speedy trial was made on 8 January 1975 and there it was made on 22 January 1975 and trial proceedings here began on 3 April 1975 and there on 27 March 1975. Both accused were confined on the day of the robbery, 30 December 1974. I agree with the majority as stated in *Warrington* that the differences in the two cases is insufficient to distinguish them and permit different results. For the reasons set forth in my separate opinion in *Warrington*, I would find that the appellant has not been denied a speedy trial and affirm the findings and sentence as approved on review below.